

LAW OFFICES OF SIMON HARTER, ESQ.
Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 – Phone
(212) 979-0251 – Fax
Attorneys for Plaintiff, SRZ Limited

JUDGE SWEET

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 1869

---------------------------------------------------------x

SRZ LIMITED,

Plaintiff,

-against-

CLAN MARINE LIMITED,

Defendant.

---------------------------------------------------------x

**VERIFIED COMPLAINT**

RECEIVED FEB 26 2008 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, SRZ LIMITED, by its Attorneys, Law Offices of Simon Harter, Esq., as and for its Verified Complaint against the named Defendant, CLAN MARINE LIMITED, alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, in that it involves claims for breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Finally, this Court also has jurisdiction over this matter because this action also arises under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq*.

2. At all times relevant hereto, Plaintiff, SRZ Limited (formerly known as Azov Shipyard), was and still is a foreign business entity organized and existing under the laws of the Ukraine with a registered office at 2, Adm. Lunin Ave., Mariupol, 87510, Ukraine.

3. At all times relevant hereto, Defendant was and still is a foreign business entity organized and existing under the laws of Liberia, with a registered office at 73, Akti Miaouli Str., 185371, Piraeus, Greece.

4. On or about June 14, 2001, Plaintiff, then known as Azov Shipyard, in the capacity as owner, entered into a maritime contract of charter party, written on an amended BARECON 89 form, with Defendant, under which Plaintiff agreed to let and Defendant agreed to bareboat charter the Motor Vessel IVAN KOROTEEV (ex M/V Lyudmila) for a period of five years.

5. A copy of the contract is attached hereto as Exhibit "A" and incorporated by reference herein.

6. Plaintiff delivered to Defendant the aforementioned vessel under the terms of the contract which was conforming in all respects to the conditions specified in the charter.

7. Plaintiff tendered the Vessel to Defendant on December 24, 2001, which commenced, pursuant to Box 20, the five year charter period.

8. Defendant was obligated to redeliver the Vessel on December 24, 2006. In breach of the contract of charter party, Defendant did not meet its obligation of redelivery until February 4, 2007.

9. In further breach of the contract of charter party, pursuant to Additional Clause 35, Defendant did not redeliver the Vessel with the flag and name that she had at the time of delivery to Defendant.

10.    As a consequence of the aforementioned breaches of the contract of charter party, Plaintiff has suffered damages in the sum total of US $263,410.79, representing monies lost due to the difference between the then current market rate and the hire rate and loss of earnings due to Defendant's late redelivery as well as the cost Plaintiff incurred due to having the Vessel reflagged.  A copy of Plaintiff's June 25, 2007 submission to the London arbitrators, detailing the aforementioned damages, is attached hereto as Exhibit "B" and incorporated by reference herein.

11.    Additionally, Clause 14 obligated Defendant to redeliver the Vessel in the same or as good a condition as she was upon delivery and to have the Vessel's class certificates valid, pursuant to Box 12, until August 2006.

12.    In further breach of the contract of charter party, Defendant redelivered the Vessel in a condition that affected her class and without class certificates valid until August 2006.

13.    As a consequence of the aforementioned breaches of the contract of charter party, Plaintiff has suffered damages in the sum total of US $592,772.00, representing the total repair costs incurred by Plaintiff in order to have the Vessel meet class requirements and monies lost, which would have been earned, for the days that the Vessel was in dry-dock receiving repairs attributable to Defendant's redelivery out of class.  A copy of Gemak Shipyard's Final List of Repair Works, detailing the repairs attributable to Defendant, is attached hereto as Exhibit "C" and incorporated by reference herein.

14.    As a consequence of the foregoing, Defendant is in breach of the contract of charter party, which breaches have resulted in Plaintiff suffering damages in the amount as specified above which are now due and owing.

15.    The charter party provides, in Additional Clause 26, that any disputes arising thereunder shall be submitted to arbitration in London, England and according to English law.

16. Arbitration has commenced between Plaintiff and Defendant. Plaintiff has submitted its claims to the arbitrators as outlined above. Defendant has submitted claims that arise out of repairs to the Vessel that it undertook during the course of the charterparty and for payment of unused spares.

17. No security for Plaintiff's claim has been posted by Defendant or anyone acting on its behalf. However, Plaintiff has posted security for Defendant's claim. A copy of Plaintiff's Letter of Undertaking is attached hereto as Exhibit "D" and incorporated by reference herein.

18. In addition to an attachment in the full amount of the claim as outlined above, Plaintiff also seeks attachment over an additional sum to cover its anticipated attorneys' fees, costs and interest, all of which are recoverable in London arbitration.

19. Plaintiff estimates, to the best of its ability, that it will take approximately two years before an arbitration award is likely to be rendered in the instant action.

20. Given this time frame, Plaintiff seeks to attach funds sufficient to cover its anticipated claim of interest during the aforementioned period in the estimated amount of US $108,300.78 which is calculated at a rate of six percent, compounded quarterly, for two years.

21. Plaintiff also seeks to attach funds sufficient to cover its anticipated legal fees and costs, the recoverable portion of which is presently estimated at US $85,516.43.

22. Based upon the foregoing, the sum total sought to be attached in this action is US $1,050,000.00, consisting of Plaintiff's principal claim of US $856,182.79, interest of US $108,300.78 and recoverable legal fees and costs of US $85,516.43.

23. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but Plaintiff avers, on information and belief, that Defendant

has, or will have during the pendency of this action, assets within this District comprising, *inter alia*, cash, funds, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, or any other tangible or intangible property, of, belonging to, due, claimed by or being held by or for the benefit of Defendant (hereinafter "assets"), located at, moving through, or held by, any garnishee(s) located within this District, including but not limited to HSBC (USA) Bank; Bank of America N.A.; The Bank of New York; Citibank N.A.; JPMorganChase Bank; Standard Chartered Bank; Wachovia Bank N.A.; Deutsche Bank AG; Barclays Bank PLC; UBS A.G.; Credit Suisse; Nordea Bank Finland PLC; Fortis Financial Services LLC; ABN-AMRO Bank N.V.; American Express Bank Ltd.; Bank of China, and/or others.

        24.      Plaintiff, for its part, has satisfied all of its obligations under the terms of the charter party.

       **WHEREFORE**, Plaintiff, SRZ LIMITED, prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendant, CLAN MARINE LIMITED, citing it to appear and answer the foregoing, and failing such appearance and answer, to have judgment by default against the Defendant in the principal amount of the claim, plus interest, costs and reasonable attorneys' fees;

b.      That if Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of US $1,050,000.00, may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, or for the benefit of, Defendant, including but not limited to such assets as may be held, received or transferred in their own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions including but not limited to HSBC (USA) Bank, Bank of America, The Bank of New York, Citibank N.A., JPMorganChase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, Barclays Bank PLC, UBS A.G., Credit Suisse, Nordea Bank Finland PLC, Fortis Financial Services LLC, ABN-AMRO Bank N.V., American Express Bank Ltd., Bank

of China, and/or any other garnishees(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the London arbitration; and

d. For such other, further and different relief as this Court may deem just and proper in the circumstances.

Dated: February 25, 2008

**LAW OFFICES OF SIMON HARTER, ESQ.**
Attorneys for Plaintiff, SRZ LIMITED

By: ______________________________

Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 (Phone)
(212) 979-0251 (Fax)

## ATTORNEY VERIFICATION

**STATE OF NEW YORK** )
) **ss.:**
**COUNTY OF NEW YORK** )

**SIMON HARTER** verifies the following pursuant to 28 U.S.C. §1746:

1. I am a member of the Law Offices of Simon Harter, Esq., Attorneys for Plaintiff, SRZ LIMITED, in this action and a Member of the Bar of this Honorable Court. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information, and documentation provided by the Plaintiff and/or its duly authorized agents.

3. The reason this Verification is made by an attorney and not the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th day of February, 2008.

Simon Harter (SH-8540)
Law Offices of Simon Harter, Esq.
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 - Phone
(212) 979-0251 - Fax

# EXHIBIT "A"

First issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon 'A'" and "Barecon 'B'" Revised and amalgamated 1989

Adopted by the Documentary Committee of The Japan Shipping Exchange, Inc., Tokyo

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, September 1989

| | |
|---|---|
| 1. Shipbroker<br>N/A | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)<br>STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 89"<br>PART I |
| | 2. Place and date<br>Mariupol, Ukraine, 14.06.2001 |
| 3. Owners/Place of business<br>Azov Shipyard, 2, Adm. Lunin ave., Mariupol, 87510, Ukraine | 4. Bareboat charterers (Charterers)/Place of business<br>Clan Marine Ltd., 73, Akti Miaouli Str., 18537, Piraeus, Greece |
| 5. Vessel's name, Call Sign and Flag (Cl. 9(c))<br>m/v Ivan Koroteev - ex name, USCQ. Ukrainian flag | |
| 6. Type of Vessel<br>Dry cargo | 7. GRT/NRT<br>6641/2996 |
| 8. When/Where built<br>1975 Vyborg | 9. Total DWT (abt.) in metric tons on summer freeboard<br>7700 |
| 10. Class (Cl. 9)<br>RMRS KM*L2 | 11. Date of last special survey by the Vessel's classification society<br>August 2001 |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. To Cl. 14)<br>Class Certificates are valid on delivery until August 2006 | |
| 13. Port or Place of delivery (Cl. 2)<br>Azov Shipyard harbour | 14. Time for delivery (Cl. 3)<br>Within 65 days from the date of the present contract<br>15. Cancelling date (Cl. 4)<br>27th of August,2001<br>16. Port or Place of redelivery (Cl. 14)<br>DOP Piraeus |
| 17. Running days' notice if other than stated in Cl. 3<br>30/15/10/7/5/3/2/1 days | 18. Frequency of dry-docking if other than stated in Cl. 9(f)<br>As required by the vessel's Classification Society |
| 19. Trading Limits (Cl. 5)<br>Always between safe ports/safe berth/safe anchorages worldwide excluding any war area, which is not covered by special insurance, subject to Classification documents restriction, if any | |
| 20. Charter period<br>5 (five) years | 21. Charter hire (Cl. 10)<br>USD 550 per day pro rata (Five Hundreds Fifty American Dollars) |
| 22. Rate of interest payable acc. to Cl. 10(f) and, if applicable, acc. to PART IV<br>In accordance with Ukrainian Low | 23. Currency and method of payment (Cl. 10)<br>15 (fifteen) days in advance by telegraphic transfer in US Dollars |

Printed by The BIMCO Charter Party Editor

*(continuer)* **"BARECON 89" Standard Bareboat Charter** **PART I**

| | |
|---|---|
| 24. Place of payment; also state benificiaty and bank accound (Cl. 10)<br>see cl.28 | 25. Bank guarantee/bond (sum and place) (Cl. 22)(optional)<br>N/A |
| 26. Mortgage(s), if any, (state whether Cl 11(a) or (b) applies; if 11(b) applies state date of Deed(s) of Covenant and name of Mortgagee(s)/Place of business)(Cl. 11)<br>N/A | 27. Insurance (marine and war risks)(state value acc. to Cl. 12(f) or, if applicable, acc. to Cl. 13(k)) (also state if Cl. 13 applies)<br>see cl.12 |
| 28. Additional insurance cover, if any, for Owners' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g))<br>N/A | 29. Additional insurance cover, if any, for Charterers' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g))<br>N/A |
| 30. Latent defects (only to be filled in if period other than stated in Cl. 2)<br>N/A | 31. War cancellation (indicate countries agreed) (Cl. 24) |
| 32. Brocerage comission and to whom payable (Cl. 25)<br>5(Five) per cent of Address commission to the Charterers | |
| 33. Law and arbitration (state 26.1, 26.2, or 26.3. of Cl. 26 as agreed; if 26.3 agreed, also state place of arbitration)(Cl. 26)<br>English low to apply, London arbitration<br>Clause 26.1 to apply | 34. Number of additional clauses covering special provisions, if agreed<br>27-35 |
| 35. Newbuilding Vessel (indicate with "yes" or "no" whether Part III applies) (optional)<br>No | 36. Name of place of Builders (only to be filled in if Part III applies)<br>No |
| 37. Vessel's Yard building No.(only to be filled in if Part III applies)<br>No | 38. Date of Building Contract (only to be filled in if Part III applies)<br>No |
| 39. Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies) (optional)<br>No | 40. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies) (optional)<br>No |
| 41. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies)<br>No | 42. Country of the Underlying Registry (only to be filled in if Part V applies)<br>No |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in Boxes 35, 39 and 40. If PART III and/or PART IV and/or PART V apply, it is further mutually agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

Printed by The BIMCO Charter Party Editor

# PART II

# "BARECON 89" Standard Bareboat Charter

1. Definitions

In this Charter, the following terms shall have the meanings hereby assigned to them:

"The Owners" shall mean the person or company registered as Owners of the Vessel.

"The Charterers" shall mean the Bareboat charterers and shall not be construed to mean a time charterer or a voyage charterer.

2. Delivery (*not* applicable to newbuilding vessels)

The Vessel shall be delivered and taken over by the Charterers at the port or place indicated in Box 13, in such ready berth as the Charterers may direct.

The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter. The Vessel shall be properly documented at time of delivery.

The delivery to the Charterers of the Vessel and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under Clause 2, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be responsible for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under the Charter, provided such defects have manifested themselves within 18 months after delivery unless otherwise provided in Box 30.

3. Time for Delivery (*not* applicable to newbuilding vessels)

The Vessel to be delivered not before the date indicated in Box 14 unless with the Charterers' consent.

~~Unless otherwise agreed in Box 17, the Owners to give the Charterers not less than 30 running days' preliminary and not less than 14 days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~

The Owners to keep the Charterers closely advised of possible changes in the Vessel's position.

4. Cancelling (*not* applicable to newbuilding vessels)

Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers to have the option of cancelling this Charter without prejudice to any claim the Charterers may otherwise have on the Owners under the Charter.

If it appears that the Vessel will be delayed beyond the cancelling date, the Owners shall, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) hours of the receipt by the Charterers of such notice. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be regarded as a new cancelling date for the purpose of this Clause.

5. Trading Limits

The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 19.

The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the instruments of insurance (including any warranties expressed or implied therein) without first obtaining the consent to such employment of the Insurers and complying with such requirements as to extra premium or otherwise as the Insurers may prescribe. If required, the Charterers shall keep the Owners and the mortgagees advised of the intended employment of the Vessel.

The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.

Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

6. Surveys (*not* applicable to newbuilding vessels)

*Survey on Delivery and Redelivery.* The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-Survey including loss of time, if any, at the rate of hire per day or pro rata, also including in each case the cost of any docking and undocking, if required, in connection herewith.

7. Inspection

*Inspection.* - The Owners shall have the right at any time to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. Inspection or survey in dry-dock shall be made only when the Vessel shall be in dry-dock for the Charterers' purpose. However, the Owners shall have the right to require the Vessel to be dry-docked for inspection if the Charterers are not docking her at normal classification intervals. The fees for such inspection or survey shall in the event of the Vessel being found to be in the condition provided in Clause 9 of this Charter be payable by the Owners and shall be paid by the Charterers only in the event of the Vessel being found to require repairs or maintenance in order to achieve the condition so provided. All time taken in respect of inspection, survey or repairs shall count as time on hire and shall form part of the Charter period.

The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel. For the purpose of this Clause, the Charterers shall keep the Owners advised of the intended employment of the Vessel.

8. Inventories and Consumable Oil and Stores

A complete inventory of the Vessel's entire equipment, outfit, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. ~~The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, water and unbroached provisions, paints, oils, ropes and other consumable stores in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively.~~

9. Maintenance and Operation

(a) The Vessel shall during the Charter period be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, except as provided for in Clause 13 (l), they shall keep the Vessel with unexpired classification of the class indicated in Box 10 and with other required certificates in force at all times. The Charterers to take immediate steps to have the necessary repairs done within a reasonable time failing which the Owners shall have the right of withdrawing the Vessel from the service of the Charterers without noting any protest and without prejudice to any claim the Owners may otherwise have against the Charterers under the Charter.

Unless otherwise agreed, in the event of any improvement, structural changes or expensive new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing more than 5 per cent. of the Vessel's marine insurance value as stated in Box 27, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under the Charter, shall in the absence of agreement, be referred to arbitration according to Clause 26.

The Charterers are required to establish and maintain financial security or responsibility in respect of oil or other pollution damage as required by any government, including Federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

TOVALOP SCHEME. (*Applicable to oil tank vessels only*)- The Charterers are required to enter the Vessel under TOVALOP SCHEME or under any similar compulsory scheme upon delivery under this Charter and to maintain her so during the currency of this Charter.

(b) The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and repair the Vessel whenever required during the Charter period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including any foreign general

PAYMENT FOR ANY SUPPLIES, CHARGES, DUES AND DEBTS PRIOR TO VESSEL'S DELIVERY TO BE EFFECTED BY THE OWNERS. CHARTERERS TO BE FULLY INDEMNIFIED BY OWNERS OF ANY DAMAGES AND LOSSES, WHICH MAY ARISE DUE TO NON-PAYMENT OF THE OWNERS. SEE CL. 31

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document [illegible] BIMCO [illegible] responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this [illegible]

## PART II
## "BARECON 89" Standard Bareboat Charter

municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.

Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.

(c) ~~During the currency of this Charter, the Vessel shall retain her present name as indicated in Box 5 and shall remain under and fly the flag as indicated in Box 6.~~ Provided, however, that the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. Painting and re-painting, instalment and re-instalment to be for the Charterers' account and time used thereby to count as time on hire.

(d) The Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of the Charter.

(e) The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners.

Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.

(f) The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once in every eighteen calendar months after delivery unless otherwise agreed in Box 18.

10. Hire

(a) The Charterers shall pay to the Owners for the hire of the Vessel at the lump sum per calendar month as indicated in Box 21 commencing on and from the date and hour of her delivery to the Charterers and at and after the agreed lump sum for any part of a month. Hire to continue until the date and hour when the Vessel is redelivered by the Charterers to her Owners.

(b) Payment of Hire, except for the first and last month's Hire, if sub-clause (c) of this Clause is applicable, shall be made in cash without discount every month in advance on the first day of each month in the currency and in the manner indicated in Box 23 and at the place mentioned in Box 24.

(c) Payment of Hire for the first and last month's Hire if less than a full month shall be calculated proportionally according to the number of days in the particular calendar month and advance payment to be effected accordingly.

(d) Should the Vessel be lost or missing, Hire to cease from the date and time when she was lost or last heard of. Any Hire paid in advance to be adjusted accordingly.

(e) Time shall be of the essence in relation to payment of Hire hereunder. In default of payment beyond a period of seven running days, the Owners shall have the right to withdraw the Vessel from the service of the Charterers without noting any protest and without interference by any court or any other formality whatsoever, and shall, without prejudice to any other claim the Owners may otherwise have against the Charterers under the Charter, be entitled to damages in respect of all costs and losses incurred as a result of the Charterers' default and the ensuing withdrawal of the Vessel.

(f) Any delay in payment of Hire shall entitle the Owners to an interest at the rate per annum as agreed in Box 22. If Box 22 has not been filled in the current market rate in the country where the Owners have their Principal Place of Business shall apply.

11. Mortgage

*) (a) Owners warrant that they have not effected any mortgage of the Vessel.

*) ~~(b) The Vessel chartered under this Charter is financed by a mortgage according to the Deed(s) of Covenant annexed to this Charter and as stated in Box 26. By their counter-signature on the Deed(s) of Covenant, the Charterers undertake to have acquainted themselves with all terms, conditions and provisions of the said Deed(s) of Covenant. The Charterers undertake that they will comply with all such instructions or directions in regard to the employment, insurances, repairs and maintenance of the Vessel, etc., as laid down in the Deed(s) of Covenant or as may be directed from time to time during the currency of the Charter by the Mortgagee(s) in conformity with the Deed(s) of Covenant.~~

(c) The Owners warrant that they have not effected any mortgage(s) other than stated in Box 26 and that they will not effect any other mortgage(s) without the prior consent of the Charterers.

*) (Optional, Clauses 11(a) and 11(b) are alternatives; indicate alternative agreed in Box 26).

12. Insurance and Repairs

(a) During the Charter period the Vessel shall be kept insured by the Charterers at their expense against marine, war and Protection and Indemnity risks in such form as the Owners shall in writing approve, which approval shall not be unreasonably withheld. Such marine war and P and I insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and mortgagees (if any), and the Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. All insurance policies shall be in the joint names of the Owners and the Charterers as their interests may appear.

If the Charterers fail to arrange and keep any of the insurances provided for under the provisions of sub-clause (a) above in the manner described therein, the Owners shall notify the Charterers whereupon the Charterers shall rectify the position within seven running days, failing which Owners shall have the right to withdraw the Vessel from the service of the Charterers without prejudice to any claim the Owners may otherwise have against the Charterers.

The Charterers shall, subject to the approval of the Owners and the Underwriters, effect all insured repairs and shall undertake settlement of all costs in connection with such repairs as well as insured charges, expenses and liabilities (reimbursement to be secured by the Charterers from the Underwriters) to the extent of coverage under the insurances herein provided for.

The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.

All time used for repairs under the provisions of sub-clause (a) of this Clause and for repairs of latent defects according to Clause 2 above including any deviation shall count as time on hire and shall form part of the Charter period.

(b) If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 28 and Box 29, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.

(c) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause (a) of Clause 12, all insurance payments for such loss shall be paid to the Mortgagee, if any, in the manner described in the Deed(s) of Covenant, who shall distribute the moneys between themselves, the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the Mortgagee, if any, of any occurrences in consequence of which the Vessel is likely to become a Total Loss as defined in this Clause.

(d) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Charterers in accordance with sub-clause (a) of this Clause, this Charter shall terminate as of the date of such loss.

(e) The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.

(f) For the purpose of insurance coverage against marine and war risks under the provisions of sub-clause (a) of this Clause, the value of the Vessel is the sum indicated in Box 27.

~~13. Insurance, Repairs and Classification~~

~~(Optional, only to apply if expressly agreed and stated in Box 27, in which event Clause 12 shall be considered deleted).~~

~~(a) During the Charter period the Vessel shall be kept insured by the Owners at their expense against marine and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurtenances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. All insurance policies shall be in the joint names of the Owners and the Charterers as their interests may appear.~~

~~(b) During the Charter period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks in such form as the Owners shall in writing approve which approval shall not be~~

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

PART II

"BARECON 89" Standard Bareboat Charter

~~reasonably withheld. If the Charterers fail to arrange and keep any of the insurances provided for under the provisions of sub-clause (b) in the manner described therein, the Owners shall notify the Charterers whereupon the Charterers shall rectify the position within seven running days, failing which the Owners shall have the right to withdraw the Vessel from the service of the Charterers without prejudice to any claim the Owners may otherwise have against the Charterers.~~

~~(c) In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.~~

~~(d) The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause (a) of this Clause. The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.~~

~~(e) The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.~~

~~(f) All time used for repairs under the provisions of sub-clause (d) and (e) of this Clause and for repairs of latent defects according to Clause 2 above, including any deviation, shall count as time on hire and shall form part of the Charter period.~~

~~The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.~~

~~(g) If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 20 and Box 29, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.~~

~~(h) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause (a) of this Clause, all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~

~~(i) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause (a) of this Clause, this Charter shall terminate as of the date of such loss.~~

~~(j) The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to insurers and claim a constructive total loss.~~

~~(k) For the purpose of insurance coverage against marine and war risks under the provisions of sub-clause (a) of this Clause, the value of the Vessel is the sum indicated in Box 22.~~

~~(l) Notwithstanding anything contained in Clause 9 (a), it is agreed that under the provisions of Clause 13, if applicable, the Owners shall keep the Vessel with unexpired classification in force at all times during the Charter period.~~

14. Redelivery

The Charterers shall at the expiration of the Charter period redeliver the Vessel at a safe and ice-free port or place as indicated in Box 16. The Charterers shall give the Owners not less than 30 running days' preliminary and not less than 14 days' definite notice of expected date, range of ports of redelivery or port or place of redelivery. Any changes thereafter in Vessel's position shall be notified immediately to the Owners.

Should the Vessel be ordered on a voyage by which the Charter period may be exceeded the Charterers to have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charter.

The Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.

The Vessel upon redelivery shall have her survey cycles up to date and class certificates valid for at least the number of months agreed in Box 12.

15. Non-Lien and Indemnity

The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel.

The Charterers further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter period a notice reading as follows:

"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

The Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter period while she is under the control of the Charterers, and against any claims against the Owners arising out of or in relation to the operation of the Vessel by the Charterers. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

16. Lien

The Owners to have a lien upon all cargoes and sub-freights belonging to the Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.

17. Salvage

All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

18. Wreck Removal

In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

19. General Average

General Average, if any, shall be adjusted according to the York-Antwerp Rules 1974 or any subsequent modification thereof current at the time of the casualty.

The Charter Hire not to contribute to General Average.

20. Assignment and Sub-Demise

The Charterers shall not assign this Charter nor sub-demise the Vessel except with the prior consent in writing of the Owners which shall not be unreasonably withheld and subject to such terms and conditions as the Owners shall approve.

21. Bills of Lading

The Charterers are to procure that all Bills of Lading issued for carriage of goods under this Charter shall contain a Paramount Clause incorporating any legislation relating to Carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the Bills of Lading shall incorporate the British Carriage of Goods by Sea Act. The Bills of Lading shall also contain the amended New Jason Clause and the Both-to-Blame Collision Clause.

The Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.

~~22. Bank Guarantee~~

~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 25 as guarantee for full performance of their obligations under this Charter.~~

~~(Optional, only to apply if Box 25 filled in).~~

23. Requisition/Acquisition

(a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter period or the period of the "Requisition for Hire" whichever be the shorter.

The Hire under this Charter shall be payable to the Owners from the same time as the Requisition Hire is payable to the Charterers.

(b) In the event of the Owners being deprived of their ownership in the Vessel

PART II

"BARECON 89" Standard Bareboat Charter

by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".

24. War

(a) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.
(b) The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.
(c) In the event of outbreak of war (whether there be a declaration of war or not) between any two or more of the countries as stated in Box 31, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 14, if she has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near open and safe port as directed by the Owners, or if she has no cargo on board, at the port at which she then is or if at sea at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with clause 10 and except as aforesaid all other provisions of this Charter shall apply until redelivery.

~~25. Commission~~

~~The Owners to pay a commission at the rate indicated in Box 32 to the Brokers named in Box 32 on any Hire paid under the Charter but in no case less than is necessary to cover the actual expenses of the Brokers and a reasonable fee for their work. If the full Hire is not paid owing to breach of Charter by either of the parties the party liable therefor to indemnify the Brokers against their loss of commission.~~

~~Should the parties agree to cancel the Charter, the Owners to indemnify the Brokers against any loss of commission but in such case the commission not to exceed the brokerage on one year's Hire.~~

26. Law and Arbitration

*) 26.1. This Charter shall be governed by English law and any dispute arising out of this Charter shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single Arbitrator appointed shall apply. If two Arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*) ~~26.2. Should any dispute arise out of this Charter, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court.~~
~~The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.~~

*) ~~26.3. Any dispute arising out of this Charter shall be referred to arbitration at the place indicated in Box 33, subject to the law and procedures applicable there.~~

~~26.4. If Box 33 in Part I is not filled in, sub-clause 26.1. of this Clause shall apply.~~

*) *26.1., 26.2. and 26.3. are alternatives; indicate alternative agreed in Box 33.*

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this

ADDITIONAL CLAUSES
TO THE BAREBOAT CHARTER PARTY "BARECON 89"
DATED 14.06.2001
FOR M/T "IVAN KOROTEEV"

*It is mutually agreed between the Owners of m/t "Ivan Koroteev" Messers. Azov Shipyard, Mariupol, Ukraine, and the Bareboat Charterers Messers. Clan Marine Ltd., that following here below concluded is the internal part of the above said bareboat charter.*

*Clause 27.*

**Description of the vessel**

NAME ex name Ivan Koroteev (Nikolay Zhukov type)
OWNERS Azov Shipyard
FLAG Ukraine
TYPE The single-screw, double deck motor ship with suplus freeboard, long forecastle, quarter deck, long poop, after engine room and house, bulbous bow and cruiser stern.
BUILT Vyborg Shipyard 1975
SDWT 7700 MTS
FULL SUMMERDRAFT 7.5 M
DEPTH MOULDER 10.2M
GRT/NRT 6641/2996
TPC ONSDWT 17.85
LOA/LBP 136.8/125.0 M
BEAM 17.8 M
CUBIC CAP BALE 10650
GRAIN 11350 CUBM
CONTAINERS 219 TEU

| | | | IFO/MDO |
|---|---|---|---|
| SPEED AND CONS. | LADEN | 12.0 KNTS | 14.5/ 2.0 |
| | BALLAST | 12.5 KNTS | 14.0/ 2.0 |
| ALONGSIDE WITH CGO OP/WITHOUT | | | 2.0/1.7 |

**Capacities of cargo spaces**

| No | Hold | Cap | | Tweendeck | Cap | |
|---|---|---|---|---|---|---|
| | L / B / H | Bale / TEU<br>Grain | | L / B | Bale / TEU<br>Grain | |
| 1 | 13.9 / 9.4 / 3.0 | 365<br>430 | 2 | 13.9 / 3.8 | 884<br>944 | 6 |
| 2 | 22.6 / 12.9 / 5.0 | 1690<br>1840 | 26 | 22.6 / 3.2 | 1437<br>1527 | 30 |
| 3 | 21.0 / 12.9 / 4.8 | 1600<br>1675 | 30 | 22.6 / 3.2 | 1412<br>1492 | 30 |
| 4 | 21.0 / 12.9 / 4.8 | 1635<br>1750 | 30 | 22.6 / 3.8 | 1627<br>1692 | 30 |
| | Total | 5290<br>5695 | 88 | | 5360<br>5655 | 96 |

DERRICKS : Ttl 4 asf : 1x16, 2x23, 3x40, 4x23

HATCH'S COVERS : No1- 9.8x8.0 Nos2,3,4-18.9x12.8

*Clause 28.*

**Owner's bank details as following:**

Benificiary name : Azov Shiprepair Yard
Benificiary account : MPL-015008-USD-3004-01
Benificiary bank : First Ukrainian International Bank
Mariupol, Ukraine, 04-182-366
Chips UID 343939
Swift: FUIB UA 2X MPL
Correspondent bank: USA Bankers Trust Company
New York, 1
Bankers Trust Plaza, Floor 16,
New York, NY 10015, POB 318
Swift: BKTRUS 33

**Charterers's bank details as following:**

BENEFICIARY NAME: CLAN MARINE LTD
BENEFICIARY ACCOUNT: 001-011089-097
BENEFICIARY BANK: H.S.B.C. BANK PLC,
PIRAEUS BRANCH,
93, AKTI MIAOULI STR.,
185 37 PIRAEUS, GREECE,
SWIFT: MIDLGRAA

*Clause 29.*

The Charterers guarantee that the next intermediate dry dock, excluding any possible emergency repair, as well as all other yard's repairing will be done at the Owners Shipyard but for their (Charterers) account, but not exceed USD 100,000.00, as stated at Clause 12, provided that the shipyards price and delivery time are competitive including the vessels voyage costs/voyage income within normal operational cost/income. Time for intermediate dry dock to count as off-hire.

*Clause 30.*

The company's responsibility for save operation of the vessel according to ISM-Code is passed to the Charterers for their account and responsibility.

*Clause 31.*

The vessel shall be re-delivered from present Charter with the same quantity of the bunkers, lubricant oils, fresh water and other materials and spare parts as on time of delivery and no payment to be made by both parties neither on delivery nor on re-delivery.

*Clause 32.*

The parts Nos III, IV, V to be fully deleted and not used until completion of the current charter party.

*Clause 33.*

IT IS EXPRESSLY AGREED BY THE PARTIES HERETO THAT THIS RIDER SHALL BE READ TOGETHER WITH "BARECON 89" STANDARD FORM AS FILLED IN AND/OR AMENDED BY THE PARTIES, AND THAT BOTH TOGETHER SHALL FORM THE ONLY ONE AGREEMENT BETWEEN THEM, AND THAT IN THE EVENT OF ANY DISCREPANCIES BETWEEN THE RIDER CLAUSES AND THE STANDARD FORM, THIS RIDER SHALL ALWAYS PREVAIL.

ANY FUTURE AMENDMENTS WILL ONLY BIND PARTIES IF IN WRITING AND SIGNED BY BOTH AS INTENDED AMENDMENTS HEREOF.

*Clause 34.*

THE CHARTERERS HAVE RIGHT TO SEND THEIR TECHNICAL SURVEYOR DURING THE PRESENT REPAIR ON THEIR OWN ACCOUNT FOR PROVIDING TECHNICAL CONDITION REPAIR SURVEY. ALSO, THE CHARTERERS HAVE RIGHT TO SEND ON BOARD THE VESSEL THEIR CREW MEMBERS (UP TO SIX PERSONS) DURING THE PRESENT REPAIR FOR FAMILIARIZATION. THE OWNERS AND THEIR CREW WILL COOPERATE FULLY WITH CHARTERERS' REPRESENTATIVE AND THEIR CREW.

*Clause 35.*

THE VESSEL MUST BE REDELIVERED FROM THIS CHARTER TO THE OWNERS BY THE CHARTERERS, FOR THEIR CHARTERERE'S ACCOUNT, WITH THE FLAG AND THE NAME OF THE VESSEL AS SHE HAD ON TIME OF DELIVERY.

| Owners | Charterers |
|---|---|
| Y. Karnaukh<br>As Director | Y. Petrosian<br>As Managing Director |

# EXHIBIT "B"



25 June 2007

Our ref: TC/ML/S360/2

tom.crampton@laxlaw.co.uk

Mark Hamsher
18c Ensign Street
London
E1 8JD

Alan Oakley
Hoy's Farm
Upwick Green
Albury, Ware
Hertfordshire
SG11 2LD

Dear Sirs

**Lyudmila c/p 14.06.01**

1. We should be grateful if the tribunal would treat this letter as defence and counterclaim submissions on behalf of our clients, SRZ Limited, "Owners" in resepct of their disputes with Clan Marine Limited, "Charterers". We also refer the tribunal to our clients' request for further and better particulars and disclosure of documents, also of today's date.

**<u>Defence to Counterclaim</u>**

2. Charterers' claim arises out of repairs to the ship undertaken by the charterers in this bareboat charterparty. Under clause 9 of the charterparty (**attachment 1**), Charterers were required to maintain the vessel during the currency of the charterparty:

   *Maintenance and Operation. (a) The Vessel shall during the Charter period be in the full possession and at the absolute disposal for all purposes of the Charterers and under their completecontrol in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurlenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, exept as provided for in Clausel 13(l), they shall keep the Vessel with unexpired classification of the class indicated in Box 10 and with other required certificates in force at all time. The Charterers to take immediate steps to have the necessary repairs done within a reasonable time falling which the Owners shall have the right of without*

Lax & Co LLP 78 Cornhill London EC3V 3QQ
Telephone: + 44 (0) 20 7623 9432
Fax: + 44 (0) 20 7623 9431
Website: www.laxlaw.co.uk

Partners Mike Lax Stuart Dench Tom Crampton

Lax & Co LLP is a Limited Liability Partnership registered in England and Wales under registration number OC3[illegible]
and is regulated by the Law Society

*noting any protest and without prejudice to any claim the Owners may otherwise have against the Charterers under the Charter.*

In addition, Charterers were obliged to repair the vessel and, the time spent repairing the vessel would count as on-hire:

*Insurance and Repairs. (a) During the Charter period the Vessel shall be kept insured by the Charterers at their expense against marine, war and Protection and Indemnity risks in such form as the Owners shall in writing approve, which approval shall not be unreasonably withheld. Such marine war and P. and I. Insurances shall be arranged by the Charterers to protect the interest of both the Owners and the Charterers and mortgagees (if any), and the Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. All insurance policies shall be in the joint names of the Owners and the Charterers as their interests may appear...*

*The Charterers shall, subject to the approval of the Owners and the Underwriters, effect all insured repairs and shall undertake settlement of all costs in connection with such repairs as well as insured charges, expenses and liabilities (reimbursement to be secured by the Charterers from the Underwriters) to the extent of coverage under the insurances herein provided for.*

*The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.*

*All time used for repairs under the provisions of sub-clause (a) of this Clause and for repairs of latent defects according to Clause 2 above including any deviation shall count as time on hire and shall form part of the Charter period.*

3. In addition to those clauses obliging Charterers to maintain and repair the vessel – clauses common in bareboat charterparties – a clause was included in the charterparty requiring the Charterers to undertake repairs at the Owners' shipyard The Owners at the commencement of the charterparty were "Azov Shipyard" (the present Owners, SRZ Ltd are the legal successors to Azov Shipyard under Ukrainian law and to operate the shipyard so obviously Owners had an interest in Charterers conducting repairs at their shipyard.

4. The clause, additional clause 29 read as follows:

*The Charterers guarantee that the next intermediate dry dock, excluding any possible emergency repair, as well as all other yard's repairing will be done at the Owners Shipyard but for their (Charterers) account, but not exceed USD 100,000.00, as stated at Clause 12, provided that the shipyards price and*

*delivery time are competetive including the vessels voyage costs/voyage income within normal operational cost/income. Time for intermediate dry dock to count as off-hire.*

5. Under this clause, Charterers guaranteed that the next intermediate dry docking and any other repair ("*all other yard's repairing*") would be undertaken at Owners' yard. This guarantee was subject to the following exceptions:

   (1) Emergency repairs;

   (2) Repairs where the cost exceeded USD100,000;

   (3) Where the Owners' price/delivery times (taking into account the vessel's voyage costs) were not competitive.

6. The charterparty obligation on Charterers (subject to the above) to repair at Owners' yard read: "*...will be done at the Owners shipyard but for their (Charterers) account*". Charterers, at paragraph 3(1) of their submissions wrongly submit that additional clause 29 thereby placed an obligation on Charterers' to pay for the next intermediate dry dock. The obligation to maintain and repair is contained in clauses 9 and 12. The purpose of the words *"for Charterers' account"* in clause 29 is to emphasise that the obligation created by those clauses is not displaced by the fact that the vessel is to be repaired at Owners' shipyard – ie, just because Owners' shipyard is repairing the vessel, it does not mean that Charterers' obligation to bear the costs of repair the vessel is affected.

7. The only words on which Charterers rely to limit their liability to USD100,000, are the words appearing in clause 12. However, those words merely identify one of the exceptions to the general rule that Charterers had to repair the ship at Owners' yard. If, as Charterers have submitted, the parties had intended that Charterers would bear the costs of repairs up to USD100,000, but the Owners would bear the costs of repairs over that figure, then this very important amendment would be set out in clear terms. Moreover, the words which Charterers ay impose that limit upon their obligation to repair would not have been inserted into a clause dealing with Charterers' obligation to repair the vessel at Owners' yard. Instead they would have been included in clause 12 (and possibly also clause 9). The parties certainly took the trouble to amend the standard form of clause 12, inserting their own specific amendment into line 244 of the charterparty so there would have been no reason not to also amend clause 12 to limit Charterers' liability accordingly, if that had been agreed.

8. As to Charterers' submissions:

   (a) Paragraph 3 is denied for the reasons set out above;

   (b) Paragraphs 4 and 5 are admitted;

(c) No admissions are made as to paragraphs 6 and 7;

(d) No admissions are made as to paragraph 8. In particular, Charterers are put to proof on the cost of the repairs and whether Charterers paid for the repairs;

(e) Paragraph 9 is admitted, save that Charterers' interpretation of clause 29 is denied. It is noted that although Charterers purported to consider the sum of USD206,253 as a "freight advance" they were not sufficiently confident to deduct that amount from hire paid under the charterparty during the remaining twenty months of the charterparty;

(f) Paragraph 10 is admitted;

(g) It is not clear what point Charterers are trying to make about the Ivanovo/Anna repairs. Owners disagreed with Charterers' interpretation of both charterparties and Charterers paid for the cost of repairing the Ivanovo/Anna in full (in any event, the disputes on the Anna are subject to separate arbitration). Furthermore, we note Charterers' message attached at p 29 to the claim submissions that the reference to USD100,000 *"was not intended to set aside Charterers' liability limits but* ***only to qualify the conditions, under which the Charterers may be entitled to have the vessel repaired in shipyard other than that of the Owners****"* (emphasis added) – we agree with that analysis of the clause.

(h) Paragraphs 12 and 13 are admitted;

(i) As to paragraph 14, no admissions are made.

(j) As to paragraph 15, Charterers' interpretation of Owners' message is rather selective. As part of an overall deal, Owners offered to pay 50% of the repair cost balance. This offer was made in order to secure the overall deal on favourable terms to Owners – as Charterers noted in their message attached at p. 37 of the attachments to the claim submissions, the hire rate Owners were asking for was above the market rate. Owners' offer to pay 50% of the repair costs was something that Owners felt that they needed to do in order to secure the commercial deal. (Incidentally, if Charterers felt that that offer had any significance as to the merits of this case, then they would not have chosen to refer to it in their claim submissions since it would attract the without prejudice privilege.)

(k) Paragraph 16 is admitted, save that Charterers' interpretation of the clause is disputed and also that Charterers are put to proof that the purported off-hire period did indeed equate to time for intermediate dry dock under clause 29.

(l) As to paragraph 17:

(1) Denied. The parties agreed that Charterers would be responsible for the repair costs of the vessel as per cl 12 of the charterparty. Clause 29 is a clause concerned with the location of the repairs and it does not affect the extent of Charterers' liabilty to pay for the repairs (see Charterers' own understanding of the clause at p 29 of the attachments to the claim submissions).

(2) Charterers have brought this claim several months after the end of the charterparty and several years after the disagreement arose. If they have additional documentary evidence which supported their case there is no reason not to disclose it now (and they are in any event obliged to do so under the LMAA Rules). Additionally Charterers should particularise their case on what oral evidence they say supports their case. We wrote to Charterers to ask them to do so, but they have thus far refused to respond (**attachment 2**).

(3) Denied. As with sub-paragraph 2 above, Charterers have been asked to particularise their case on market rates but have so far refused/are unable to do so. The reference to USD100,000 referred to an exception to Charterers' obligation to repair the vessel at Owners' yard, as pleaded above.

(m) As to paragraph 19, it is noted that Charterers' alternative case that the clause that they rely on as the sole source of the limit of their liability for repairs is ambiguous. It is not understood why, if it is ambiguous, it should be interpreted in Charterers' favour – the suggestion that it should be so interpreted so as to give effect to the agreement between the parties simply begs the question as to what was agreed between the parties. Owners say that that agreement is clear.

9. **Redelivery of the vessel**:

As set out below, in breach of charter, Charterers failed to redeliver the vessel on time (24 December 2006). In mitigation of Owners' losses arising from that breach, Owners provisionally agreed a date of 1 February to take redelivery. However, the need to obtain crew visas delayed Owners' preparations and it was not possible to take redelivery until 4 February. In doing so, Owners were not in breach of charter, so Charterers have no claim in this regard.

10. **Unused spares and stores**:

No admissions are made as to the values quoted by Charterers. As to paragraph 25, Charterers' vague pleading that they are entitled to payment for unused spares in

the sum of USD200,000 is thoroughly inadequate. Owners have asked Charterers to properly particularise their case, but again they have refused to do so. Owners can make no pleading on this point until Charterers make their case intelligible.

Accordingly, Charterers' claims are denied and Owners claim their costs of defending the claims.

**COUNTERCLAIM**

11. By a bareboat charterparty dated 14 June 2001, then owners, Azov Shipyard, charterered the Lyudmila (ex Ivan Koroteev, now Victoriya, but referred to throughout these submissions as the Lyudmila) to Charterers. By an addendum dated 22 July 2003 (attached at the back of attachment 1) Azov Shipyard were replaced as owners under the charterparty by SRZ Ltd. The charterparty included, inter alia, the following terms:

    *Box 20. Charter period*
    *5 (five) years*

    *Cl 17. Redelivery*
    *The Charterers shall at the expiration of the Charter period redeliver the vessel at a safe and ice-free port.*

    *cl. 35*
    *The vessel must be redelivered from this Charter to the Owners by the Charterers for their Charterere's* [sic] *account, with the flag and name of the vessel as she had on time of delivery.*

12. The vessel was delivered into Charterers' service on 24 December 2001 (see attached protocol of delivery – **attachment 3**). As per box 20 of the charterparty, the charter period was five years and, accordingly, the vessel was due to be redelivered on 24 December 2006. In breach of charter, Charterers failed to redeliver the vessel until 1630 hours GMT 4 February 2007 (see attached redelivery protocol – **attachment 4**), when she was redelivered at Piraeus.

13. In further breach of charter, contrary to clause 35, Charterers failed to redeliver the vessel with the flag and name that she had on delivery into the charterparty. As a result of Charterers' breach, Owners had to re-flag the vessel after the conclusion of the charterparty causing delay to the vessel's delivery into the next fixture. The vessel eventually left Piraeus at 1850 hours GMT 21 February 2007.

14. As a result of the aforesaid breaches, Owners suffered the following losses:

    (a) The difference between the market rate and the bareboat hire rate from the contractual redelivery date of 24 December 2006 0000 hours GMT on

1 January 2007 (to reflect bareboat hire payments made by Charterers - see paragraph 17(a) below);

(b) Loss of earnings from 1 January 2007 to 21 February (see paragraph 17(b) below);

(c) The costs of reflagging the vessel (as per paragraph 18 below).

15. We attach at **attachment 5** a copy of the recap for the vessel's first fixture after sailing from Piraeus. This fixture was concluded on 15 February, and is the best evidence of the market rate that the vessel would have been able to achieve had she been redelivered in accordance with the charterparty on 24 December 2006.

16. Also attached at **attachment 6** is a voyage estimate prepared by the Owners, taking into account the costs of performing the voyage, to produce a time-charter daily equivalent rate of USD4,427. This is the best evidence of Owners' losses arising out of Charterers' failure to redeliver the vessel on time.

17. Accordingly, Owners claim:

(a) USD3,877  (USD4,427 – USD550) x 6.3125 days (24 December to 0000 hours 1 January 2007): **USD24,473.56.** (This gives credit for the hire payment at the charterparty rate that Charterers made for the whole of December.)

(b) USD4,427 x 52.7847 days (0000 hours GMT 1 January to 1850 hours GMT 21 February): **USD233,677.96**.

18. As per paragraph 5(c) above, Owners also had to incur expenses in re-flagging the vessel. Attached at **attachment 7** is a bundle of documents showing total expenses incurred by Owners for the reflagging of the vessel as follows:

(1) traveling allowance of shipowners representative Mr.N.Tupikin  and class society's representative. **UKH18,296.25**
(2) survey of the vessel under ISPS Code's requirements and issue of the temporary ships certificate. **UKH3862.08**
(3) examination of security plan under ISPS Code's requirements. **UKH3576.00**
(4) registration of satellite ships station in international system INMARSAT. **UKH825**

**Total: UKH26,559.33**

At the then exchange rate of USD1 to UKH5.05 = **USD5,259.27**

19. Owners therefore claim: **USD263,410.79**, plus interest and costs.

Yours faithfully

**LAX & CO LLP**

Cc: Hill Dickinson
2 Defteras Merarchias Street
Piraeus 185 35
Greece
Your Ref: PHHL23/2/mgp

# EXHIBIT "C"



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | | DECK | | | | |
| 1 | 1. | Docking & Undocking | | | | |
| 1 | a. | Docking & Undocking operations including entrance day | total | 1 | 3,000.00 | 3,000 |
| 1 | b. | Subsequent days in drydock & Undocking day | day | 5 | 1,570.00 | 7,850 |
| 1 | 1.3 | Mooring & Unmooring | | | | |
| 1 | | Shore riggers and mooring boat assistance to the vessel (Compulsory) : | | | | |
| 1 | a. | Arrival and departure | total | 1 | 700.00 | 700 |
| 1 | b. | Shifting on & off dry-dock to berth | total | 1 | 700.00 | 700 |
| 1 | 2. | Shore Electric Power | | | | |
| 1 | a. | Electric current line to connect & disconnect | line | 3 | 70.00 | 210 |
| 1 | b. | Electric current supply (380 V, 50 Hz) | kw | 8126 | 0.42 | 3,413 |
| 1 | 4. | Fire Precautions (compulsory) | | | | |
| 1 | a. | Fire line to connect and disconnect | line | 3 | 70.00 | 210 |
| 1 | b. | Fire line sea water supply | day | 28 | 95.00 | 2,660 |
| 1 | c. | Fire watchman / foreman (per 8 hours shift) - Approx. 3men / day | manday | 90 | 120.00 | 10,800 |
| 1 | 7. | Gangway (compulsory) | | | | |
| 1 | - | Installation of gangway upon safe berthing and removal of same on completion of works | pcs | 3 | 120.00 | 360 |
| 1 | 8. | Sewage Disposal (Compulsory in drydock) | | | | |
| 1 | a. | Sewage drain pipe connect & disconnect | line | 1 | 70.00 | 70 |
| 1 | b. | Sewage discharge to Yard's facilities | day | 6 | 95.00 | 570 |
| 1 | A. | HULL TREATMENT | | | | |
| 1 | | Washing | | | | |
| 1 | i. | 500 bars HPFWJ washing of the hull | m² | 5660 | 1.50 | 8,490 |
| 1 | ii. | LPFW washing after first coat of paint | m² | 5660 | 0.70 | 3,962 |
| 1 | A.1 | Hull from light to deep line :Boot top 1000 m² | | | | |
| 1 | 1. | Grit blasting of to SA 2.0 spot %25 | m² | 250 | 12.50 | 3,125 |
| 1 | 2. | Grit blasting of to SA 1.0 spot %45 | m² | 450 | 10.50 | 4,725 |
| 1 | 3. | 1 coat x T/U painting of primer | m² | 770 | 1.10 | 847 |
| 1 | 4. | 2 coat x F/C painting of antifouling | m² | 2000 | 0.90 | 1,800 |
| 1 | A.2 | Underwater hull : Vertical side and flat bottom 2950 m² | | | | |
| 1 | 1.a | Grit blasting of to SA 2.0 spot %15 vertical side | m² | 188 | 12.50 | 2,350 |
| 1 | 1.b | Grit blasting of to SA 1.0 spot %25 vertical side | m² | 313 | 10.50 | 3,287 |
| 1 | 1.c | Grit blasting of to SA 2.0 spot %15 flat bottom | m² | 257 | 12.50 | 3,213 |
| 1 | 2. | 1 coat x T/U painting of primer | m² | 833 | 1.10 | 916 |
| 1 | 3. | 2coat x F/C painting of antifouling | m² | 5920 | 0.90 | 5,328 |
| 1 | 4. | Renewal of hull and sea chests' anodes with Owner's spares (material excluded) | pcs | 65 | 18.00 | 1,170 |
| 1 | A.3 | Freeboard;Top side 1700 m² | | | | |
| 1 | 1. | Grit blasting of to SA 2.0 spot %10 | m² | 170 | 12.50 | 2,125 |
| 1 | 2. | Grit blasting of to SA 1.0 spot %20 | m² | 340 | 10.50 | 3,570 |
| 1 | 3. | 1 coat x T/U painting of primer | m² | 561 | 1.10 | 617 |
| 1 | 4. | 1 coat x F/C painting of black finish | m² | 1700 | 0.90 | 1,530 |
| 1 | A.4 | Sea Chests | | | | |
| 1 | a. | Removal of grid, HP washing and scrapping, painting of sea chests as per bottom scheme and refitting of grids with new fasteners | pcs | 4 | 420.00 | 1,680 |
| 1 | A.5 | Deeping and waterline marks | | | | |

17.04.2007 16:36



GEMAK SHIPYARD

REPAIR WORKS FINAL LIST OF

M/V VICTORIYA

| Worl | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | a. | Painting of draft & plimsoll's marks and ship's names & port of registry including bulbous bow and tug marks (painting of company logos and line letters to be extra if needed) | total | 1 | 1,350.00 | 1,350 |
| 1 | b. | Repainting of waterline between bottom-boottop and/or between boottop-topside | m | 548 | 3.50 | 1,918 |
| 1 | | General Surface Treatment Notes: | | | | |
| 1 | - | Installation of plugs/extension pipes for deck scuppers and overboard discharges to be charged extra by 20 USD/pcs. | pcs | '8 | 20.00 | 160 |
| 1 | - | Anchor chains : 2 pcs, | | | | |
| 1 | 1-7. | Ranging of both anchors and chains on dock pontoon, washing by HPFW jet, calibration and recording of chain weardown, marking of lengths and kenters with white/red paint and s.s. wire and restoration of chains. | side | 2 | 825.00 | 1,650 |
| 1 | | Mechanical Part | | | | |
| 1 | 1. | Propeller : 4-blades, D : 4,500mm, Weight : 10,347kgs, Bronze | | | | |
| 1 | - | Remove protective housing, cone, unlock and remove the lead nut, screw Clean screw and polish. Detect screw flanges per the detection results, polish the screw, install on shaft, install cone and protective housing | pcs | 1 | 4,150.00 | 4,150 |
| 1 | 2. | Drive shafting | | | | |
| 1 | - | Taking and recording of tailshaft weardown readings before and after | pcs | 1 | 750.00 | 750 |
| 1 | - | Discoupling of int. shaft and lift up aside, removal of interfering in way, pulling of tailshaft inside E.R. for survey inspection. Cleaning & inspection of stern tube. Afterwards, refitting of all parts | total | 1 | 8,750.00 | 8,750 |
| 1 | - | Removal of fwd and/or aft seal boxes to workshop, disassembling for cleaning and inspection, boxing up with Owner supplied new seals and refitting back | box | 2 | 1,200.00 | 2,400 |
| 1 | - | Skimming and polishing of simplex chrome liners (per pcs) | pcs | 2 | 550.00 | 1,100 |
| 1 | - | Magnaflux test of tailshaft taper part and key groove in presence of Class | pcs | 1 | 600.00 | 600 |
| 1 | 3. | Rudder | | | | |
| 1 | - | Measure clearances of top and low rudder pintle | pcs | 1 | 525.00 | 525 |
| 1 | - | Pressure test of rudder blade, including open/close drain plug (per time) | pcs | 1 | 400.00 | 400 |
| 1 | 4. | Sea Valves | | | | |
| 1 | # | Overhauling of following valves | | | | |
| 1 | - | DN300 | pcs | 2 | 540.00 | 1,080 |
| 1 | - | DN200 | pcs | 1 | 360.00 | 360 |
| 1 | - | DN150 | pcs | 1 | 270.00 | 270 |
| 1 | | Hatch and tweendeck covers | | | | |
| 1 | 6. | Removal of old packing and fitting of Owner's supplied new rubber packing - Glue to be Owner's supplied | m | 380 | 11.00 | 4,180 |
| 1 | 6/1. | Comer packing adjustemnt | pcs | 14 | 15.00 | 210 |
| 1 | 8. | Waterproof tests as per the Register regulation - hose test | hold | 4 | 500.00 | 2,000 |
| 1 | | Boat handling gear | | | | |
| 1 | 1/3. | Life-boat to deliver on shore, detect and deliver boats on the board, install in positions | pcs | 2 | 500.00 | 1,000 |
| 1 | | Main Ladder/Accommodation Ladder | | | | |
| 1 | 2. | Test ladders and davits per the rules of Register, | pcs | 2 | 400.00 | 800 |
| 1 | | Deck gears | | | | |
| 1 | 1/5. | Anchor-Mooring Capstan | | | | |

Т/Х Вікторія

КОД 32183383



GEMAK SHIPYARD

REPAIR WORKS FINAL LIST OF

M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | iv. | Releasing brake band assemblies from linkage and transport to workshop, removal of brake linings from bands, cleaning and coating of bands, fitting of new Owner's supplied ferrodo linings and refitting on board (per m of brake lining) 2 pcs fwd and 2 pcs afft mooring winches | m | 8 | 350.00 | 2,800 |
| 1 | | Drives of hatch covers | | | | |
| 1 | 16. | Hydro cylinders D 320mm -1 pc + 2 spare; D 140mm 6pcs | | | | |
| 1 | a. | Dismounting and removal to hyd. cylinders to workshop. Opening up for inspection, replacement of seals with ship's spares, boxing back and refitting in place on completion | | | | |
| 1 | - | D320mm | pcs | 2 | 1,150.00 | 2,300 |
| 1 | - | D320 mm spare pressure testing at workshop | pcs | 2 | 575.00 | 1,150 |
| 1 | - | D140mm | pcs | 2 | 850.00 | 1,700 |
| 1 | | TANKS | | | | |
| 1 | 26. | Degas, open the manholes of store diesel tanks 1m2 ( volume 2 x 96 m3) | | | | |
| 1 | a. | Cleaning of D.O. tanks for hot work including lighting and ventilation (per m³ of tank volume - Min.35m³/tank) | m³ | 192 | 21.00 | 4,032 |
| 1 | b. | in addition to above tank cleaning price, removal and disposal of sludge to authorised shore facility (per m³ of sludge) | m³ | 1 | 180.00 | 180 |
| 1 | | STEEL RENEWALS | | | | |
| 1 | A. | Renewal of A Grade, flat steel plating together with attached frames/stiffeners in open spaces (based on total steel renewal on board) | | | | |
| 1 | 1. | No:1 cargo hold steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 197 | 5.02 | 989 |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 16 pcs | kg | 400 | 4.56 | 1,825 |
| 1 | 2. | No:2 cargo hold steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 101 pcs | kg | 2525 | 4.56 | 11,514 |
| 1 | b.2 | Between 25-100 kg | kg | 1296 | 4.56 | 5,910 |
| 1 | 3. | No:3 cargo hold steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 5 pcs | kg | 125 | 4.56 | 570 |
| 1 | 4. | No:4 cargo hold steel works as follows | | | | |
| 1 | b. | A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 25 pcs | kg | 625 | 4.56 | 2,850 |
| 1 | 5. | Bulwark steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.1 | Below 25 kg 40 pcs | kg | 1000 | 5.02 | 5,020 |
| 1 | 6. | Main deck fore castle deck steel wors as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a. | Below 25 kg 1 pcs | kg | 25 | 4.56 | 114 |
| 1 | a.3 | Above 100 kg | kg | 363 | 4.18 | 1,517 |
| | 7. | Cargo holds access steel works as follows | | | | |
| 1 | a. | Below 10 mm below | kg | 850 | 3.51 | 2,985 |
| 1 | B. | Steel works in different places ; | | | | |
| 1 | | D.B., Wing/Side ballast tanks incl. shell, deck and slopping plates iwo these tanks to be 10% extra. | | | | |

Т/Х "Вікторія"



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | 1. | No:2 port DB ballast tank steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.3 | Above 100 kg | kg | 290 | 4.18 | 1,212 |
| 1 | 2. | No:8 port DB ballast tank steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.3 | Above 100 kg | kg | 634 | 4.18 | 2,650 |
| 1 | c. | Below 10 mm A bulb profiles steel work | | | | |
| 1 | c.1 | Below 25 kg 1 pcs | kg | 25 | 5.71 | 143 |
| 1 | c.2 | Between 25-100 kg | kg | 115 | 6.22 | 715 |
| 1 | 3. | No:9 stb DB ballast tank steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.3 | Above 100 kg | kg | 1357 | 4.18 | 5,672 |
| 1 | c. | Below 10 mm A bulb profiles steel work | | | | |
| 1 | c.2 | Between 25-100 kg | kg | 150 | 6.22 | 933 |
| 1 | 4. | No:1 port DB ballast tank steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.2 | Between 25-100 kg | kg | 156 | 5.02 | 783 |
| 1 | b.3 | Above 100 kg | kg | 6154 | 4.18 | 25.724 |
| 1 | 5. | No:4 port DB ballast tank steel works as follows | | | | |
| 1 | a. | A grade steel works | | | | |
| 1 | a.1 | Below 25 kg 11 pcs | kg | 275 | 5.02 | 1,381 |
| 1 | c. | Below 10 mm A bulb profiles steel work | | | | |
| 1 | c.2 | Between 25-100 kg | kg | 401 | 6.22 | 2,494 |
| 1 | 6. | No:5 stb DB ballast tank steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.1 | Below 25 kg 3 pcs | kg | 75 | 5.02 | 377 |
| 1 | c. | Below 10 mm A bulb profiles steel work | | | | |
| 1 | c.1 | Between 25-100 kg | kg | 249 | 6.22 | 1,549 |
| 1 | 7. | No:2 stb DB ballast tank steel works as follows | | | | |
| 1 | c. | Below 10 mm A bulb profiles steel work | | | | |
| 1 | c.2 | Between 25-100 kg | kg | 31 | 6.22 | 193 |
| 1 | 8. | No:3 port DB ballast tank steel works as follows | | | | |
| 1 | c. | A grade bulb profiles steel work | | | | |
| 1 | c.1 | Below 25 kg 8 pcs | kg | 200 | 5.72 | 1,144 |
| 1 | 9. | No:4 port wing ballast tank steel works as follows | | | | |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 8 pcs | kg | 200 | 5.02 | 1,004 |
| 1 | b.2 | Between 25-100 kg | kg | 399 | 5.02 | 2,003 |
| 1 | b.3 | Above 100 kg | kg | 631 | 4.18 | 2,638 |
| 1 | 10. | No:11 stb wing ballast tank steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 955 | 5.52 | 5,272 |
| 1 | a.3 | Above 100 kg | kg | 855 | 4.60 | 3,933 |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 14 pcs | kg | 350 | 5.02 | 1,757 |
| 1 | b.2 | Between 25-100 kg | kg | 530 | 5.02 | 2,661 |
| 1 | 11. | No:10 port wing ballast tank steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |

Т/Х "Вікторія"



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | a.2 | Between 25-100 kg | kg | 495 | 5.52 | 2,732 |
| 1 | a.3 | Above 100 kg | kg | 221 | 4.60 | 1,017 |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 9 pcs | kg | 225 | 5.02 | 1,130 |
| 1 | 12. | No:7 stb wing ballast tank steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 336 | 5.52 | 1,855 |
| 1 | a.3 | Above 100 kg | kg | 113 | 4.60 | 520 |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 8 pcs | kg | 200 | 5.02 | 1,004 |
| 1 | b.2 | Between 25-100 kg | kg | 875 | 5.02 | 4,393 |
| 1 | b.3 | Above 100 kg | kg | 422 | 4.18 | 1,764 |
| 1 | 13. | Access steel works in DB , wing ballast and fresh water tanks as follows | | | | |
| 1 | a. | Between 25-100 kg above 10 mm thick steel | kg | 287 | 3.51 | 1,008 |
| 1 | - | Fore peak, chain locker and aft peak tanks, deep tanks and narrow void spaces to be 25% extra. | | | | |
| 1 | 1. | Fore peak tank steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 1214 | 6.27 | 7,612 |
| 1 | a.3 | Above 100 kg | kg | 1683 | 5.23 | 8,802 |
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 106 pcs | kg | 2650 | 5.70 | 15,105 |
| 1 | b.2 | Between 25-100 kg | kg | 5115 | 5.70 | 29,156 |
| 1 | 2. | Fore peak tank access steel works as follows | | | | |
| 1 | a.1 | Below 25 kg 4 pcs | kg | 100 | 4.39 | 439 |
| 1 | a.2 | Between 25-100 kg | kg | 132 | 4.39 | 579 |
| 1 | - | Hatch coamings, hatch covers to be 15% extra. Hatch cover skirt plate, compression bar, rubber channel, etc. and hatch coaming truckway to be quoted separately. | | | | |
| 1 | 1. | Hatch covers steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.1 | Below 25 kg 22 pcs | kg | 550 | 5.24 | 2,882 |
| 1 | b. | 40x10 and 60x10 flat bar | m | 78 | 75.00 | 5,850 |
| 1 | - | F.O./D.O. Tanks, duct keel and engine room to be 20% extra. | | | | |
| 1 | 1. | Port/stb wind D/O tanks steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 224 | 6.02 | 1,348 |
| 1 | 2. | Tunnel steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.1 | Between 25-100 kg | kg | 53 | 6.02 | 319 |
| 1 | 3. | E/R steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a. | Between 25-100 kg | kg | 75 | 6.02 | 452 |
| 1 | - | Bulbous bow to be 75% extra, | | | | |
| 1 | 1. | Bulbous steel works as follows | | | | |
| 1 | a. | Below 10 mm A grade steel works | | | | |
| 1 | a.2 | Between 25-100 kg | kg | 412 | 8.78 | 3,617 |
| 1 | a.3 | Above 100 kg | kg | 108 | 7.32 | 790 |

Т/Х "Вікторія"




GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 1 | b. | Above 10 mm A grade steel works | | | | |
| 1 | b.1 | Below 25 kg 18 pcs | kg | 450 | 7.98 | 3,591 |
| 1 | b.2 | Between 25-100 kg | kg | 263 | 7.98 | 2,099 |
| 1 | b.3 | Above 100 kg | kg | 556 | 6.65 | 3,697 |
| 1 | H. | General Steel Work Notes: | | | | |
| 1 | b) | Staging is included in steel renewal prices for min.1000kg steel renewal ordered above a staging tower of 6m² base area. Otherwise staging will be charged extra. | m³ | 38 | 7.50 | 285 |
| 1 | m) | In case less than 500kg steel renewal is ordered in a location i.e. holds, tanks, void spaces, E.R. accommodation area for mobilization of cutting and welding equipment. | location | 6 | 450.00 | 2,700 |
| 2 | | ADDITIONAL WORK | | | | |
| 2 | 1. | Garbage Disposal | | | | |
| 2 | - | Placing two garbage containers onboard, one for domestic and one for all other garbage (Price per removal & disposal of container) | | | | |
| 2 | - | Domestic garbage container | pcs | 8 | 90.00 | 720 |
| 2 | - | Other garbage container (excluding mud or sludge) | pcs | 7 | 150.00 | 1,050 |
| 2 | 2. | Telephone Service | | | | |
| 2 | - | Telephone line to connect & disconnect | line | 3 | 50.00 | 150 |
| 2 | 4. | Crane service | | | | |
| 2 | a. | Crane service for Owner's usage (max. 20 t x 14 m. - min. one hour) | hour | 12 | 125.00 | 1,500 |
| 2 | 5. | Cooling Water Line | | | | |
| 2 | - | Cooling sea water supply | day | 6 | 90.00 | 540 |
| 2 | - | Cooling water line to connect & disconnect | line | 1 | 70.00 | 70 |
| 2 | 6. | Ballast Water Line | | | | |
| 2 | - | Ballast water supply for undocking | ton | 640 | 1.25 | 800 |
| 2 | - | Ballast water line to connect & disconnect | line | 5 | 75.00 | 375 |
| 2 | 7. | Fresh Water Line | | | | |
| 2 | - | Fresh water supply (from wharf by trucks) | ton | 42 | 7.00 | 294 |
| 2 | - | Fresh water line to connect & disconnect | line | 2 | 75.00 | 150 |
| 2 | 8. | Propeller blades polishing and dye test | | | | |
| 2 | a. | Dry polishing of propeller by means of disc grinders | pcs | 1 | 775.00 | 775 |
| 2 | b. | Dye penetration test of propeller blade roots and tips (per blade) | pcs | 4 | 100.00 | 400 |
| 3 | | ADDITIONAL WORK | | | | |



GEMAK

GEMAK SHIPYARD

REPAIR WORKS FINAL LIST OF

M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 3 | 16. | Renewal of vertical ladders in ballast tanks 20x20 mm square bar steps, 60x10 mm sides, mild steel, including lugs & bolts (Price for per running meter) | m | 7.25 | 300.00 | 2,175 |

"Вікторія" КОД 32183383



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Worf | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 3 | 17. | Renewal of ladder steps in ballast tanks welded to bulkheads as per sample (20mm square bar, price for per piece) | pcs | 88 | 75.00 | 6,600 |
| 3 | 18. | Securing of No:1,2,3,4 hatch covers in open position for rubber packing renewal and steel works in place by welding stoppers on truck way against side rollers | total | 1 | 3,500.00 | 3,500 |
| 3 | 19. | Erection and removal of staging of hatch cover sides for rubber packing renewal - Min.25m³ per location | m³ | 250 | 7.50 | 1,875 |
| 4 | | ADDITIONAL WORK | | | | |
| 4 | 1. | Dismantling of deck cranes hydraulic oil cooler removal to workshop, opening the covers, chemical cleaning, pressure testing, painting of covers with Owner supplied paint,reinstalling back with new gaskets upon completion (Appx.Ø350x600, draining/refilling and testing of the syetem to be done by ship's crew and any other work to be extra) | pcs | 8 | 1,000.00 | 8,000 |
| 4 | 2. | Fabrication and installation of drip trays around FO/DO tanks air vent pipes on main deck with 1 pcs of drain plug (Appx size :500x400x500 mm 6 mm thick mild steel , any other works to be extra) | pcs | 7 | 380.00 | 2,660 |
| 4 | 3. | Cleaning of E/R bilge for hot work | total | 1 | 3,900.00 | 3,900 |
| 4 | 4. | Transrerring of DO from port wing DO tank to wing stb DO tank with portable pump upon completion of cleaning of port wing DO tank transferring of wing stb DO tank to port wing DO tank ( Assuming presently each tank has 21 m³ of DO) | total | 1 | 800.00 | 800 |
| 4 | 5. | Building up of grooves by welding on hatch coamings top plate - Price for per pass of welding seam (Each scattered seamt to be assumed as min.1m) | m | 409.5 | 14.00 | 5,733 |
| 4 | 6. | Installation and removal of temporary hand rails around stringer openings in fore peak tank | total | 1 | 800.00 | 800 |
| 5 | | ADDITIONAL WORK | | | | |
| 5 | 1. | Fabrication of new covers (mild steel) and stainless steel wiremesh with new gasket and bolts for ventilation pipe heads of No:3 HFO tank 160x220 mm (Subject to commencing cold work , if hot work required removal and blinding of the air vent pipe to be extra) ,No:1 DB port/stb 250x350 mm, Fore peak tank 250x350 mm , No:7 port DB 200x290 | pcs | 5 | 300.00 | 1,500 |
| 5 | 3. | Repairing of stb side fire box fwd of super structure r upper outer rubber packing channel flat bar (25x5, 900 mm) including removal and refitting of rubber packing. | pcs | 1 | 100.00 | 100 |
| 5 | 4. | No:2 and 3 Cargo hold enterance trunks with cover on cross deck between No:2 and 3 cargo holds ;620x750 h:620 mm in size 10 mm thick trunk with 1 pcs square bar step and cover complete with packing channel, packing, dogs ,4 pcs butterfly bolts,securing device and 2 pcs hinges with A grade 6 mm thick mild steel | pcs | 2 | 2,850.00 | 5,700 |
| 5 | 5. | Renewal of 150x350 mm 8 mm thick bracket and installation of 2 pcs doubler 600x350 mm and 600x100 mm 6 mm thich on ventilation trunk for No:2,3 hold on cross deck | total | 1 | 500.00 | 500 |
| 5 | 6. | Cropping off and grinding of 2 pcs electric boxes near No:2 hold aft port and No:1 hold fwd stb hatch covers pistons.(Removal of cables to be done by Ship's electrician) | total | 1 | 150.00 | 150 |
| 5 | 7. | Renewal of handrails on port stb life boat deck , on port stb ladders from aft poop deck to life boat deck and main deck as per Ship's marking as follows | | 0 | 0.00 | 0 |
| 5 | a. | DN 40 SCH 40 pipe | m | 28 | 41.00 | 1,148 |
| 5 | b. | DN 25-20 SCH 40 pipe and square bar | m | 35 | 30.00 | 1,050 |
| 5 | c. | DN 40 SCH 40 pipe bending | pcs | 14 | 19.00 | 266 |
| 5 | d. | DN 20 SCH 40 pipe bending | pcs | 12 | 16.00 | 192 |
| 5 | 8. | Renewal of 1st step of port side aft poop deck ladder to life boat deck 800x190 double curved 5-6 mm thick and 25x5 flat bar | pcs | 1 | 130.00 | 130 |

Т/Х "Вікторія"

GEMAK

GEMAK SHIPYARD

REPAIR WORKS FINAL LIST OF

M/V VICTORIYA

| Worf | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 5 | 8.ext | Renewal of side 50x10 flat bar of stb side aft poop deck ladder to life boat deck 2 pcs 800 mm | total | 1 | 130.00 | 130 |
| 5 | 9. | Renewal of 2 pcs hyraulic control unit box covers (550x450 , 520x470 mm 5 mm thick A grade ) complete with packing channel, packing, dogs ,3 pcs butterfly bolts and 2 pcs hinges with A grade 6 mm thick mild steel on No:1 hold fwd stb hatch coaming. | pcs | 2 | 950.00 | 1,900 |
| 5 | 10. | Renewal of forecastle deck windlass foundation brackets as per light steel renewal tariff general steel renewal notes to be applied. | total | 1 | 1,650.00 | 1,650 |
| 5 | 11. | Renewal of anchor chain stopper foundation as pe rlight steel renewal tariff and general steel renewal notes to be applied. | total | 1 | 2,000.00 | 2,000 |
| 5 | 12. | Renewal of DN 40 SCH 40 appx. 2 meter handrail pipe welded on ladder coaming on stb fore catle deck to main deck | pcs | 1 | 250.00 | 250 |
| 5 | 13. | Installation of DN 125 cable protection pipe in 2 halves 300 mm in height and filling of upper section pipe with water tight compound near by stb fore castle deck ladder to main deck | total | 1 | 350.00 | 350 |
| 5 | 14. | Renewal of rubber packing inner flat bar (20x5 mm) and rubber packing of starboard side passageway enterance trunk cover 670x670 mm | pcs | 1 | 350.00 | 350 |
| 5 | 15. | Renewal of 500x200 mm double curved 5 mm thick section of steering gear ventilation head mushroom including removal and refitting of the mushroom | total | 1 | 350.00 | 350 |
| 5 | 16. | Renewal of the sealing flatbars on hatch coaming top as per ship's marking 40x10mm A grade flat bar, min 1mtr to be charged for each scattered piece ,price for per running meter (Appx. 200 m) including crane or cherr picker usage. | m | 156 | 60.00 | 9,360 |
| 5 | 17. | Renewal of electric box cover (420x220 mm) complete with packing channel, packing, dogs ,2 pcs butterfly bolts and 2 pcs hinges with A grade 5 mm thick mild steel on No:2 hold fwd stb hatch coaming. | pcs | 1 | 600.00 | 600 |
| 5 | 18. | Dismounting of stb accommodation ladders, transferring to workshop, refitting upon completion of repairs (removal and refitting of wiring to be done by ship's crew , any repair to be extra) | pcs | 1 | 550.00 | 550 |
| 5 | 19. | Fabrication and installation of1 pc 900x200 mm DN 25 SCH 40 pipe U type handrail and 2 pcs 400x150 mm 20x20xmm square bar steps on deck stb crane foundation between No:3-4 holds | total | 1 | 400.00 | 400 |
| 5 | 20. | Renwal of vertical ladder on stb side hatch coaming between 2-3 hold with supports 1100 x420 mm 60x10 mm flat bar sides and 3 pcs 20x20x sqare bar steps | total | 1 | 350.00 | 350 |
| 5 | 21. | Fabrication and installation of 4 pcs 400x150 mm 20x20 sqare bar steps (2 pcs on each side) and DN 25 SCH 40 pipe 2 pcs 800x1000 mm U type hadrail (on top plating) on crane stopper foundation on crosss deck between 2-3 holds (Price for per foundation) | pcs | 2 | 700.00 | 1,400 |
| 5 | 22. | Fabrication and renewal of 5 pcs watertight door with coaming 700x1700 mm ( Fwd welding workshop, fwd CO2 room, fwd paint locker, fwd crane house port side and aft port life boat deck fan room dors) | pcs | 5 | 2,500.00 | 12,500 |
| 5 | 23. | Welding of the crack from one side (on top) and installaion of 400x200 mm 10 mm thick doubler on No:1 hold hatch covers port main hinge top plating (This work is out of guarantee in agreed terms and conditions in Work Order No:1) | total | 1 | 250.00 | 250 |
| 5 | 24. | Renewal of lower portion (800x150 mm) of stb life boat deck fire equipments room door including renewal of rubber packing channel and removal and refitting of the door and rubber packing iwo steel renewal . | total | 1 | 600.00 | 600 |
| | | ADDITIONAL WORK | | | | |
| 6 | 1 | Supply and installation of DN150/100 storm overboard valves cast steel body (No any approved certificate is available) | pcs | 2 | 1,100.00 | 2,200 |

ТзХ "Вікторія" КОД 32183383



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 6 | 2. | Neccessary pipe/flange modification for installation of above valves | total | 1 | 200.00 | 200 |
| 7 | | ADDITIONAL WORK | | | | |
| 7 | 1. | Supply and installation of fuel leakage system for 3 pcs D/G as follows | | | | |
| 7 | a. | 18 pcs fuel leakage branch line | | | | |
| 7 | b. | 3 pcs fuel leakage collection line | | | | |
| 7 | c. | 3 pcs fuel leakege collection tank | | | | |
| 7 | d. | 3 pcs floating switch | | | | |
| 7 | e. | 1 pc Siemens alarm panel | | | | |
| 7 | f. | 1 pc buzzer | | | | |
| 7 | g. | 50 meter cable | | | | |
| 7 | h. | Total cost for above | pcs | 1 | 6,500.00 | 6,500 |
| 7 | 2. | Supply of intermediate shaft bearing sealing rings as per sample (This work is out of guarantee in agreed terms and conditions in Work Order No:1 due to non original spare parts) | pcs | 8 | 250.00 | 2,000 |
| 7 | 3. | Sewage water disposal | | | | |
| 7 | 5. | Welding of doubler plates Ø100x12 mm where the holes opened on sheel plating to drain ballast tanks in the dock (This work is out of guarantee in agreed terms and conditions in Work Order No:1) | pcs | 9 | 75.00 | 675 |
| 7 | 6. | Disconnection of life boat davit's wire blocks , transfering to workshop for steel work , removal/refitting of sheaves, upon copmletion of steel work refitting in place.(Repairing of of wire blocks to be priced after and extra on Owner's account, removal and refitting of steel wires to be done by ship's crew) | pcs | 4 | 275.00 | 1,100 |
| 7 | 7. | Erection and removal of staging for removal/refitting of life boat davit's wire blocks -Min.25m³ for per location | m³ | 126 | 7.50 | 945 |
| 7 | 13. | Chipping / mechanical cleaning and 1x coat priming of packing retaining channel (in addition to rubber renewal price. paint to be Owner's supplied) | m | 430 | 9.00 | 3,870 |
| 7 | 14. | Renewal of fish plate 65x10 mm flat bar appx. 2 meter on stb fore castle deck to main deck enterance | total | 1 | 150.00 | 150 |
| 8 | | ADDITIONAL WORK | | | | |
| 8 | 2. | CO2 system inspection, level check and certification | total | 1 | 350.00 | 350 |
| 8 | 11. | Port & Stbd Fwd & Aft mooring winches brake lining repair jobs: | | | | |
| 8 | 11.1 | Fabrication of new brake linings and cheek plates according to Yard's drawing | set | 4 | 1,200.00 | 4,800 |
| 8 | 11.3 | Supply of 4sets FAG 51207 type ball bearings (if not to be supplied by the vessel) | pcs | 4 | 25.00 | 100 |
| 8 | 11.4 | Fabrication of new ball bearing housings and stopper washers on the cleats of brake linings due to corrosion on existing ones: | | | | |
| 8 | a. | Ø/L=80/40mm, 1040steel | pcs | 4 | 150.00 | 600 |
| 8 | b. | Ø/L=50/20mm, 1040steel | pcs | 4 | 150.00 | 600 |
| 8 | 12. | Fabrication of spanner for propeller securing nut and deliveria to the vessel | pcs | 1 | 300.00 | 300 |
| 8 | 13. | Renewal of pipe protections in No:3 hold as per marking as follows | | | | |
| 8 | a. | 60x5 mm flat bar (Parts less than 1 meter to be charged as 1 meter) | m | 18 | 60.00 | 1,080 |



GEMAK SHIPYARD

REPAIR WORKS FINAL LIST OF

M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 8 | b. | 50x50x5 angle bar (Parts less than 1 meter to be charged as 1 meter) | m | 17 | 70.00 | 1,190 |
| 8 | 15. | Renewal of No:3 hold fwd port side hatch coaming drainage box 280x280x80 mm 8 mm thick A grade, drain valve to be reused | total | 1 | 250.00 | 250 |
| 8 | 16. | Supply of clamps and flexible hoses for deck cranes hydaulic oil cooler pipe connections as per samples | total | 1 | 50.00 | 50 |
| 8 | 17. | Cropping off and grinding of 4 pcs ladder steps from bottom on No:3 hold aft bulhead port side | total | 1 | 100.00 | 100 |
| 8 | 18. | Renewal of No:3 hold ventilation channel closing plate (350x100 L type 2500 mm in lenght 6 mm thick ) and bottom plate 800x600x8 mm and installation of doubler plate fwd of air trunk 800x200x8 mm icluding erection and removal of staging | total | 1 | 900.00 | 900 |
| 8 | 19. | Renewal of fore peak tank ventilation head inner box 250x350x200 mm 6 mm thick mild steel | total | 1 | 250.00 | 250 |
| 8 | 20. | Removal and feritting/renewal of pipes for access for steel work as follows | | 0 | 0.00 | 0 |
| 8 | - | No:1 DB air vent pipes:2 m DN 150 SCH 50 pipe, 2 pcs DN 150 sleeve and 2 pcs DN 150 doubler | total | 1 | 824.00 | 824 |
| 8 | - | Fore peak tank sounding pipe:DN 50 SCH 40 pipe 4 m, DN 50 sleeve 2 pcs and DN 50 U-bolt 2 pcs | total | 1 | 397.00 | 397 |
| 8 | - | No:3 hold hydaulic pipe :2 pcs Dn 20 SS sleeve | total | 1 | 150.00 | 150 |
| 9 | | ADDITIONAL WORK | | | | |
| 9 | 1. | Pumping out remaining ballast water in ballast tanks after puping out with ship's balalst pumps | total | 1 | 900.00 | 900 |
| 9 | 2. | Port/stb life boat works as follows | | | | |
| 9 | a. | Disconnection and removal of No:1 life boat propeller shaft for inspection including removal and refitting of rudder blade for access .(Any other work to be extra) | pcs | 1 | 800.00 | 800 |
| 9 | b. | Renewal of No:2 life boat drain plugs 2 pcs | pcs | 2 | 200.00 | 400 |
| 9 | c. | Reinforcement of No:1 life boat engine connection supports to hull with fiberglass application | total | 1 | 850.00 | 850 |
| 9 | d. | Sand papering of of existing paint on complete hull of lifeboats , application of Yard's supplied orange colored jelly coat and painting of markings as per sample including new SOLAS tapes | pcs | 2 | 2,525.00 | 5,050 |
| 10 | | PIPING WORKS | | | | |
| 10 | 1. | Sea water pipe in E/R drawin No:722-B1-001 SCH 40 | | | | |
| 10 | - | DN80 straight pipe | m | 8 | 89.00 | 712 |
| 10 | - | DN65 straight pipe | m | 1 | 82.00 | 82 |
| 10 | - | DN32 straight pipe | m | 4 | 45.00 | 180 |
| 10 | - | DN80 90° - 1.5D elbow | pcs | 3 | 44.00 | 132 |
| 10 | - | DN65 90° - 1.5D elbow | pcs | 1 | 35.00 | 35 |
| 10 | - | DN80 45° - 1.5D elbow | pcs | 3 | 33.00 | 99 |
| 10 | - | DN32, 90°-1.5D elbow | pcs | 3 | 23.00 | 69 |
| 10 | - | DN80/DN65 reducer | pcs | 1 | 89.00 | 89 |
| 10 | - | DN100/DN80 reducer | pcs | 2 | 118.00 | 236 |
| 10 | - | DN32/DN40 reducer | pcs | 2 | 51.00 | 102 |
| 10 | - | DN80 flange | pcs | 6 | 46.00 | 276 |
| 10 | - | DN65 flange | pcs | 1 | 36.00 | 36 |
| 10 | - | DN40 flange | pcs | 1 | 26.00 | 26 |
| 10 | - | DN32 flanges | pcs | 1 | 23.00 | 23 |
| 10 | - | DN100 flanges | pcs | 2 | 52.00 | 104 |
| 10 | - | DN80 collar (Ø120/Ø91 t=12mm.) | pcs | 1 | 46.00 | 46 |
| 10 | - | DN80 collar (Ø140/Ø91 t=12mm.) | pcs | 1 | 53.00 | 53 |
| 10 | - | DN80 collar (Ø163/Ø91 t=12mm.) | pcs | 1 | 60.00 | 60 |

Т/Х "Вікторія"



# GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 10 | 2. | Sewage Line in E/R drawin NO:722-B1-002 SCH40 | | | | |
| 10 | - | DN50 straight pipe | m | 7.64 | 62.00 | 474 |
| 10 | - | DN 50 bending | pcs | 4 | 27.00 | 108 |
| 10 | - | DN50 flanges | pcs | 5 | 30.00 | 150 |
| 10 | - | DN50 collar | pcs | 3 | 30.00 | 90 |
| 10 | - | Existing nippel access | pcs | 3 | 30.00 | 90 |
| 10 | 3. | Sewage Line in E/R drawin No:722-B1-003 SCH40 | | | | |
| 10 | - | DN32 straight pipe | m | 11.35 | 46.00 | 522 |
| 10 | - | DN50 straight pipe | m | 6 | 62.00 | 372 |
| 10 | - | DN32, 90°-1.5D and bending | pcs | 5 | 23.00 | 115 |
| 10 | - | DN50, 90°-1.5D and bending | pcs | 4 | 28.00 | 112 |
| 10 | - | DN32 flanges | pcs | 6 | 23.00 | 138 |
| 10 | - | DN50 flanges | pcs | 4 | 30.00 | 120 |
| 10 | - | DN32 collar (Ø64/Ø43 t=10mm) | pcs | 1 | 23.00 | 23 |
| 10 | - | DN 32 nippel access | pcs | 4 | 32.00 | 128 |
| 10 | - | DN50 collar (Ø87/Ø62 t=10mm) | pcs | 1 | 30.00 | 30 |
| 10 | - | DN50 collar (Ø86/Ø43 t=10mm) | pcs | 2 | 30.00 | 60 |
| 10 | - | DN50 clamp | pcs | 2 | 62.00 | 124 |
| 10 | 4. | Sewage Line in E/R drawin No:722-B1-004 SCH40 | | | | |
| 10 | - | DN80 straight pipe | m | 8.99 | 89.00 | 800 |
| 10 | - | DN50 straight pipe | m | 8 | 62.00 | 496 |
| 10 | - | DN50 pipe bending | pcs | 3 | 27.00 | 81 |
| 10 | - | DN65 straight pipe | m | 1 | 82.00 | 82 |
| 10 | - | DN40 straight pipe | m | 1 | 52.00 | 52 |
| 10 | - | DN80, 90°-1.5D elbow | pcs | 3 | 44.00 | 132 |
| 10 | - | DN80, 45°-1.5D elbow | pcs | 2 | 33.00 | 66 |
| 10 | - | DN100/DN80 reducer | pcs | 1 | 118.00 | 118 |
| 10 | | Dn 32 existing nippel access | pcs | 1 | 32.00 | 32 |
| 10 | - | DN80 flange | pcs | 5 | 46.00 | 230 |
| 10 | - | DN40 flange | pcs | 1 | 26.00 | 26 |
| 10 | - | DN50 flange | pcs | 6 | 32.00 | 192 |
| 10 | - | DN65 flange | pcs | 1 | 36.00 | 36 |
| 10 | - | DN100 PN 10 flange | pcs | 1 | 41.00 | 41 |
| 10 | - | DN150 JIS 5k flange | pcs | 1 | 98.00 | 98 |
| 10 | - | DN80 collar | pcs | 3 | 46.00 | 138 |
| 10 | - | DN50 collar | pcs | 2 | 32.00 | 64 |
| 10 | - | DN150/DN100 Storm valve installation | pcs | 1 | 75.00 | 75 |
| 10 | 5. | Sewage Line in M/R dravin No: 722-B1-005 SCH40 | | 0 | 0.00 | 0 |
| 10 | - | DN65 straight pipe | m | 4.5 | 82.00 | 369 |
| 10 | - | DN65 45° - 1.5D elbow | pcs | 4 | 28.00 | 112 |
| 10 | - | DN65 flange | pcs | 2 | 36.00 | 72 |
| 10 | 6. | Aux. engine cooling line in E/R drawin No: 722-B1-006 SCH40 | | | | |
| 10 | - | DN80 straight pipe | m | 1 | 89.00 | 89 |
| 10 | - | DN80 90°-1.5D elbow | pcs | 1 | 44.00 | 44 |
| 10 | - | DN80 flange | pcs | 1 | 46.00 | 46 |
| | | Cooling sea water line in E/R drawin No: 722-B1-007 SCH40 | | | | |
| 10 | - | DN125 straigh pipe | m | 5 | 156.00 | 780 |

Т/Х "Вікторія"



**GEMAK**

## GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Worf. | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 10 | - | DN125, 90°-1.5D | pcs | 1 | 95.00 | 95 |
| 10 | - | DN125, 45°-1.5D | pcs | 2 | 72.00 | 144 |
| 10 | - | DN125 flange | pcs | 3 | 69.00 | 207 |
| 10 | - | DN125 coller | pcs | 3 | 69.00 | 207 |
| 10 | 8. | Air comp. cooling line in E/R drawin No: 722-B1-008 SCH40 | | | | |
| 10 | - | DN80 straight pipe | m | 2 | 89.00 | 178 |
| 10 | - | DN32 straight pipe | m | 2 | 45.00 | 90 |
| 10 | - | DN80, 90°-1.5D elbow | pcs | 1 | 44.00 | 44 |
| 10 | - | DN80/DN50 reducer | pcs | 1 | 89.00 | 89 |
| 10 | - | DN50 flange | pcs | 1 | 30.00 | 30 |
| 10 | - | DN32 flange | pcs | 1 | 23.00 | 23 |
| 10 | - | DN80 flange | pcs | 1 | 46.00 | 46 |
| 10 | - | DN32 coller | pcs | 1 | 23.00 | 23 |
| 10 | - | Special nipel(machining on lathe) | pcs | 1 | 50.00 | 50 |
| 10 | 9. | Ballast overboard line in E/R drawin No: 722-B1-009 SCH40 | | | | |
| 10 | - | DN125 straight pipe | m | 3 | 157.00 | 471 |
| 10 | - | DN125, 45°-1.5D elbow | pcs | 1 | 72.00 | 72 |
| 10 | - | DN125 flange | pcs | 3 | 69.00 | 207 |
| 10 | - | DN125 collar | pcs | 3 | 69.00 | 207 |
| 10 | - | Existing nippel access | pcs | 1 | 30.00 | 30 |
| 10 | 10. | Aux engine cooling pipe in E/R drawin No: 722-B1-010 | | | | |
| 10 | - | DN100 straight pipe cunife 90-10 | m | 2 | 450.00 | 900 |
| 10 | - | DN100, 90°-1.5D elbow cunife 90-10 | pcs | 1 | 283.00 | 283 |
| 10 | - | DN100 flange | pcs | 1 | 52.00 | 52 |
| 10 | - | DN100 collar | pcs | 1 | 52.00 | 52 |
| 10 | 11. | Shaft bearing cooling water line in E/R drawin No: 722-B1 -011 SCH40 | | | | |
| 10 | - | DN20 straight pipe | m | 4 | 38.00 | 152 |
| 10 | - | DN20, 90°-1.5D elbow and bending | pcs | 3 | 20.00 | 60 |
| 10 | - | Access DN 20 coupling | pcs | 2 | 30.00 | 60 |
| 10 | 12. | M/E cooling suction pipe in E/R drawin No: 722-B1-012 SCH40 | | | | |
| 10 | - | DN200 straight pipe | m | 2 | 275.00 | 550 |
| 10 | - | DN200, 90°-1.5D elbow | pcs | 1 | 216.00 | 216 |
| 10 | - | DN200 flange | pcs | 2 | 119.00 | 238 |
| 10 | - | DN200 collar (special) | pcs | 2 | 119.00 | 238 |
| 10 | 13. | Fire pump suction in E/R drawin No: 722-B1-013 | | | | |
| 10 | - | DN100 straight pipe | m | 2 | 118.00 | 236 |
| 10 | - | DN100, 45°-1.5D elbow | pcs | 1 | 45.00 | 45 |
| 10 | - | DN100 flange | pcs | 2 | 52.00 | 104 |
| 10 | - | DN100 collar | pcs | 2 | 52.00 | 104 |
| 10 | 14. | Sewage pipe in E/R drawin No: 722-B1-014 SCH40 | | | | |
| 10 | - | DN80 straight pipe | m | 3 | 89.00 | 267 |
| 10 | - | DN80, 45°-1.5D elbow | pcs | 2 | 34.00 | 68 |
| 10 | - | DN[illegible]/DN80 reducer | pcs | 1 | 118.00 | 118 |
| 10 | - | DN80 flange | pcs | 1 | 46.00 | 46 |
| 10 | - | DN100 PN10 flange | pcs | 1 | 52.00 | 52 |
| 10 | - | DN150 PN10(According to DN125 pipe) flange | pcs | 1 | 88.00 | 88 |

Т/Х "Вікторія"



GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 10 | - | DN150/DN100 storm valve installation | pcs | 1 | 75.00 | 75 |
| 10 | 15. | Sounding pipe in cargo hold no:3 drawin No: 722-B2-001 SCH40 | | | | |
| 10 | - | DN50 straight pipe | m | 1.5 | 62.00 | 93 |
| 10 | - | DN50 sleeve | pcs | 1 | 62.00 | 62 |
| 10 | 16. | Cooler sea water pipes in aft crane house drawin No: 722-B2-002 SCH40 | | | | |
| 10 | - | DN40 straight pipe | m | 14.63 | 52.00 | 761 |
| 10 | - | DN 40 bending | pcs | 10 | 25.00 | 250 |
| 10 | - | DN40 flange | pcs | 4 | 26.00 | 104 |
| 10 | - | DN40 collar | pcs | 4 | 26.00 | 104 |
| 10 | - | Special noozle | pcs | 4 | 60.00 | 240 |
| 10 | 17. | No:2 air ventilation pipe in main deck portside drawin No: 722-B2-003 SCH40 | | | | |
| 10 | - | DN150, 90°-1.5D elbow | pcs | 2 | 121.00 | 242 |
| 10 | - | DN 150 flange access | pcs | 2 | 63.00 | 126 |
| 10 | 18. | Cooler sea water pipes in aft crane house drawin No: 722-B2-004 SCH40 | | | | |
| 10 | - | DN40 straight pipe | m | 9.34 | 52.00 | 486 |
| 10 | - | DN 40 bending | pcs | 7 | 25.00 | 175 |
| 10 | - | DN40 flange | pcs | 2 | 26.00 | 52 |
| 10 | - | DN40 collar | pcs | 2 | 26.00 | 52 |
| 10 | - | Special noozle | pcs | 2 | 60.00 | 120 |
| 10 | - | DN 20 muff | pcs | 1 | 30.00 | 30 |
| 11 | | ADDITIONAL WORK | | | | |
| 11 | 1. | Gas free inspection and report by an authorised chemist for port/stb wing D/O tanks | pcs | 2 | 275.00 | 550 |
| 11 | 2. | Renewal of worned out weldings of STB accomodation ladder.(21 pcs) | total | 1 | 500.00 | 500 |
| 11 | 3. | Cropping of existing "C" letter on right side of plimsoll marks on port & stbd sides of hull plate and welding of "Y" letter (new letter height 100mm, letter width: 67mm, width of strip: 20mm) including crane usage | total | 1 | 500.00 | 500 |
| 11 | 4. | | | | | |
| 11 | - | | | | | |
| 11 | - | | | | | |
| 11 | 5. | Alingement control of No:1 life boat propeller shaft and polishing of bearing working surface on lathe machine,supply of propeller shaft bearing and gland packing as per sample | total | 1 | 700.00 | 700 |
| 11 | 6. | Renewal of No:1,2 life boats fender ropes chrome connection rings and missing wooden handles as per sample | total | 1 | 600.00 | 600 |
| 12 | | ADDITIONAL WORK | | | | |
| 12 | 1. | Renewal of 2 pcs electric control unit box covers (285x345 mm ) complete with packing channel, packing, dogs ,2 pcs butterfly bolts and 2 pcs hinges with A grade 6 mm thick mild steel on No:1 hold fwd hatch coaming. | pcs | 2 | 600.00 | 1,200 |
| 12 | 2. | Pressure testing of port stb D/O wing tanks with air | pcs | 2 | 350.00 | 700 |
| 12 | 3. | Renewal of DN 40 SCH 40 appx. 2 meter handrail pipe welded on ladder coaming and light foundation 260x460x 6 mm thick with 2 DN 20 pipe supports on stb ladder coaming fore castle deck to main deck | total | 1 | 600.00 | 600 |
| 12 | 4. | Hatch cover hydraulic cylinder works as follows | | | | |
| 12 | 1. | No:2 hold aft stb center and fwd port hatch cover hydraulic cylinders | | | | |
| 12 | b. | Honing of hydraulic cylinder inner surface due to scracthes Ø320 L=750 mm -price for per piece | pcs | 2 | 800.00 | 1,600 |

T/X Вікторія



## GEMAK SHIPYARD

## REPAIR WORKS FINAL LIST OF

## M/V VICTORIYA

| Work | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| 12 | c. | Drilling and retreading of broken lower purging plugs aand fabrication of new purging plugs -Price for per piece | pcs | 2 | 150.00 | 300 |
| 12 | d. | Supply of 40 pcs M20x60 allen head bolts and 40 pcs M20 spring washers | total | 1 | 150.00 | 150 |
| 12 | e. | Reconditioning of No:2 hold aft stb center hatch cover hydraulic cylinders rod connection head treads due to deformation | pcs | 1 | 200.00 | 200 |
| 12 | 2. | 2 pcs Ø320 mm spare hydraulic cylinders | | | | |
| 12 | a. | Drilling and retreading of broken upper and lower purging plugs aand fabrication of new purging plugs -Price for per piece | pcs | 3 | 150.00 | 450 |
| 12 | b. | Drilling and retreading of new holes for dust seal connection bolts due to broken bolts-Price for per cover | pcs | 2 | 150.00 | 300 |
| 12 | 4. | Supply of seals as per sample as follows | | | | |
| 12 | a. | 70x90x10 mm hydraulic seals 2 pcs | | | | |
| 12 | b. | 140x160x10 mm hydaulic seals 2 pcs | | | | |
| 12 | c. | Dust seals as per sample 6 pcs | | | | |
| 12 | d. | Ø130x5 mm O-ring 8 pcs | | | | |
| 12 | e. | Ø70x5,5 mm O-ring 2 pcs | | | | |
| 12 | f. | Ø48,5x3,5 mm O-ring 4 pcs | | | | |
| 12 | g. | Ø335x6 mm O-ring 2 pcs | | | | |
| 12 | h. | Ø309x6 mm O-ring 2 pcs | | | | |
| 12 | i. | Ø305x8 mm O-ring 4 pcs | | | | |
| 12 | k. | Ø130x140 mm t=2,7 mm teflon ring 8 pcs | | | | |
| 12 | l. | Ø70x80 mm t=2,5 mm teflon ring 2 pcs | | | | |
| 12 | m. | Ø305x320 mm t=4 mm teflon ring 8 pcs | | | | |
| 12 | n. | Ø140x150 mm t=2,7 mm teflon ring 2 pcs | | | | |
| 12 | p. | Ø22x32 mm t=2 mm copper ring 16 pcs | | | | |
| 12 | r. | Teflon ring as per sample 2 pcs | | | | |
| 12 | s. | Total cost for above supplies (This work is out of guarantee in agreed term and coonditions in Work Order No:1 because non-original parts ) | total | 1 | 1,000.00 | 1,000 |
| 12 | 5. | Renewal of life boat davit's wire blocks upper section as per sample 570x440 mm davit connection pin housing and rollers to be reused , 3 pcs (port fwd side not to be renewed) including machining works | pcs | 3 | 800.00 | 2,400 |
| 13 | | ADDITIONAL WORK | | | | |
| 13 | 1. | Renewal of No:2 stbt side hatch coaming ( FR39) electric box ( 405x160x200 mm 5 mm thick A grade steel ) without cover -Removal and refitting of button to be done by ship's crew | pcs | 1 | 600.00 | 600 |
| 13 | 2. | Renewal of life boat davit structure pipe (350 mm DN 80 SCH 80 pipe ) as per marking (Lowering down and securing of the davit to be done by ship's crew) | pcs | 1 | 250.00 | 250 |
| 13 | 3. | Renewal of 1 pc ventilation cover (350x750 mm ) complete with packing channel, packing, dogs ,2 pcs butterfly bolts and 2 pcs hinges with A grade 5 mm thick mild steel on port life boat deck acc bulkhead. | pcs | 1 | 750.00 | 750 |
| 14 | | ADDITIONAL WORK | | | | |
| 14 | 1. | Fabrication and renewal of fore peak tank ballast valve remote control rod (Ø30 mm mildsteel) from main deck down to the valve (Existing valve handle and main deck penetration bearing and housing to be reused) as per the Yard's drawing complete with 3 pcs centering guide bearing and housing, 4 pcs Ø30 mm universal joint and 8 pcs rod connection pieces | total | 1 | 2,200.00 | 2,200 |
| 15 | | ADDITIONAL WORK | | | | |
| 15 | 1. | Fabrication of 1 pc wire guide roller for life boat davit wire blocks as per sample | pcs | 1 | 350.00 | 350 |

Т/Х "Вікторія"



GEMAK SHIPYARD

**REPAIR WORKS FINAL LIST OF**

## M/V VICTORIYA

| Worf | Item | Description | Unit | Qty | Unit Price | Total Price |
|---|---|---|---|---|---|---|
| ✓ 15 | 2. | Mechanical cleaning and 2 coats of painting with Owner's supplied paing burt areas on hull iwo steel renewal works | total | 1 | 2,230.00 | 2,230 |
| ✓ 15 | 3. | Ultrasonic water tightness control of hatch covers and reporting (Price for per hold per time and any rectification on hatch covers/coamings to be extra time and cost on Owner's account) | hold | 4 | 550.00 | 2,200 |
| ✓ 15 | 4. | Fixed foam system inspection , level check and certification | pcs | 1 | 300.00 | 300 |
| — 15 | 5. | Cutting and removal of scrap pipes in fore peak tank | total | 1 | 600.00 | 600 |
| 16 | | ADDITIONAL WORK | | | | |
| — 16 | 1. | Welding of Ø150mm steel plate which is fitted by ship's crew in the stbd side void space tank. | total | 1 | 75.00 | 75 |
| ✓ 16 | 2. | Croping of the pipe protections for steel work on No:3 and No:4 cargo hold and re-fitting back after completion of works. | total | 1 | 250.00 | 250 |
| ✓ 16 | 3. | Repairing of holes in the tunnel, ballast tanks and DO tank by welding and grinding. | pcs | 7 | 50.00 | 350 |
| ✓ 16 | 4. | Cropping of entrance ladder in cargo hold No:1 and refitting back after completion of the works. | pcs | 2 | 100.00 | 200 |
| — 16 | 5. | Repairing of holes on cargo hold No:10 longitudinal bulkhead by doubler installations- 100x50x8mm and 1300x100x8mm doublers- | total | 1 | 75.00 | 75 |
| ✓ 16 | 6. | Doubler installation on No:1 stringer plating in fore peak tank. | pcs | 2 | 75.00 | 150 |
| — 16 | 7. | Doubler installation 100x100x10, welding repairing 3 location | total | 1 | 350.00 | 350 |
| ✓ 16 | 8. | Installation of additional rubber for hatch cover and adjustment of sealing flat bars on coamings | total | 1 | 600.00 | 600 |

*Total - 478.447 $*

# EXHIBIT "D"

Lawrence Graham

To Clan Marine
C/o Latsoudis and Arvaniti Law Office,
3, Akti Miouli Str,
185 35, Piraeus
Greece

1 February 2007

Our ref: TZC/C115/13
Direct dial: +44 (0)20 7337 7612
tom.crampton@lawgram.com
doc number: 5439412.1

**BY COURIER**

Dear Sirs,

**MV LYUDMILA ex IVAN KOROTEEV c/p 14.06.01**

IN CONSIDERATION of your refraining from taking any action resulting in the arrest or detention of the above Ship, or any other Ship, asset or property in the ownership, associated ownership or management of SRZ Limited (hereinafter "Owners") for the purpose of obtaining security in respect claims under the above mentioned charterparty plus interest and costs we hereby undertake to pay to you or your solicitors on your behalf within 21 days of your or their written demand such sum or sums as may have been either awarded or adjudged to be due to you from Owners by final unappealable London arbitration award(s) or have been agreed in writing from time to time between the parties hereto to be recoverable from Owners in respect of the above Claims, interest and costs provided always that the total of our liability in respect of any claims against the Owners under the above charterparty shall not exceed the sum of US$387,326.00 (Three Hundred and Eighty-seven Thousand and Three Hundred and Twenty-six Dollars) inclusive of interest and costs.

This undertaking is not to be construed as an admission of liability and is given without prejudice to any and all rights, defences, or limitations which may be available to Owners.

This letter of undertaking shall be governed by and construed in accordance with English law and any disputes arising hereunder shall be subject to the exclusive jurisdiction of the High Court of Justice in London.

The above undertaking from us to you will not become effective unless or until Owners take physical redelivery of the above ship.

This letter of undertaking replaces the letter of undertaking issued by this firm on 29 January 2007

Yours faithfully

**LAWRENCE GRAHAM LLP**

Lawrence Graham LLP 61 St Mary Axe London EC3A 8JN Tel: +44(0)20 7621 1141
Fax: +44(0)20 7480 5156 DX: 1072 London City CDE info@lawgram.com www.lawgram.com